The opinion of the Commission of Appeals is adopted, and the mandamus refused.

## HARLINGEN INDEPENDENT SCHOOL DIST. v. C. H. PAGE & BRO.

### No. 1467—5705.

Commission of Appeals of Texas, Section A.

April 21, 1932.

Rabel & Fristoe, of Harlingen, and Davenport, West & Ransome, of Brownsville, for plaintiff in error.

Seabury, George & Taylor, of Brownsville, for defendant in error.

CRITZ, J.

This suit was filed in the district court of Cameron county, Tex., by C. H. and L. C. Page, doing business under the firm name of "Page Bros.," against Harlingen independent school district, for damages growing out of an alleged breach of contract by the district. Trial in the district court before the court without the intervention of a jury resulted in a judgment for Page Bros. in the sum of $2,426.24. Both parties were dissatisfied with this judgment and perfected separate appeals to the Court of Civil Appeals at San Antonio. On final hearing in the court last mentioned the judgment of the trial court was reversed and judgment rendered for Page Bros. in the sum of $8,033.52, the full amount sued for. 23 S. W.(2d) 829. The district has prosecuted error to this court. The facts and circumstances out of which this case grew are as follows:

On September 23, 1927, the board of trustees of the district contemplated a considerable schoolhouse building program. On such date the board ordered an election in the district to be held on October 22, 1927, to determine whether the bonds of the district in the sum of $400,000 should be issued for the purpose of providing the funds for the construction of school buildings in the district and purchasing sites therefor.

At a meeting of the board held on October 10, 1927, it selected Page Bros. to act as architects for the entire building program, and agreed to pay them 5 per cent. of the contract price of the contemplated buildings for their services. This contract was made after the election had been ordered but before it was held. Page Bros. at this time accepted the employment under the terms stated. It is undisputed that at the time of this transaction it was understood by both parties that the bond election had not been held, and that the contract was conditioned on the election resulting favorably to the bonds, and further it was understood that no services were to be rendered by Page Bros., and no money paid to them, unless and until the bonds were voted and sold, and the money actually available to the district.

At the time Page Bros. were employed as above shown, it was contemplated, and the parties understood, that the district was to erect two ward school buildings and one high school building.

After the making of the above contract the election was held and resulted favorably to the bond issue. Thereafter the board issued $120,000 of the above-authorized bonds, which were sold and the money available. Page Bros., acting on instructions from the board, and under their original contract, then prepared the plans and specifications for the two ward buildings as originally contemplated, and these buildings were duly constructed under their supervision to the satisfaction of the board. .

At some time after the bonds were voted the board made some change in its building program and decided to erect a "Mexican" school building and a building known as the "Combs" school building. Thirty thousand dollars additional bonds were issued and sold for these purposes, and Page Bros. acted as architects therefor at an agreed compensation. It seems that this work was satisfactory.

Page Bros. were paid for their services in connection with the four buildings which they acted as architects for with the exception of $426.24, which the district admits owing to them, and the answer says this sum is tendered to plaintiffs in open court; but we find no showing that such sum was actually paid into court.

At the time the original contract was made with Page Bros. and during the years 1927–28 the taxable values of the district were not sufficient to issue the $400,000 in bonds, and at the same time provide for the maintenance of the schools of the district. For that reason the balance of the bonds for the high school building were not issued until 1929, at which time the values had increased sufficiently to sustain them. All parties understood this condition when the original contract of employment was made.

After the erection of the four buildings above mentioned, and before the bonds for the high school building were issued or sold, the personnel of the school board changed as the result of an election, and the new board repudiated its further obligation to Page Bros. and employed other architects for the high school building. After employing such other architects, the balance of the bonds were issued, sold, and the money available, and the construction of the high school building commenced under the supervision of the other architects.

At the time they were discharged Page Bros. had rendered services entirely satisfactory to the board. They had done some work on the plans for the high school building at an expense to them of about $2,000. As we understand the record, this work was not ordered by the board, though some of the members thereof did from time to time confer with Page Bros. while they were doing this work. We here call attention to the fact that under the original contract no services were to be rendered or money paid unless and until the bonds were sold and the money available. The proceeds of the first two issues of bonds were all used in constructing the four buildings actually built under Page Bros.' supervision. They understood that they were to do no work on the high school building and were to receive no compensation therefor unless and until the bonds therefor were sold and the money available.

After Page Bros. were discharged the board hired other architects, issued and sold the bonds for the high school, and the money therefor became available to the district. Page Bros. then filed this suit to recover the $426.24 owing for services rendered by them on the four buildings already constructed and for damages for the breach of the alleged contract for the high school building. In the alternative, Page Bros. sought recovery for the value of the services actually rendered in preparing plans and specifications for the high school building, which plans and specifications were never accepted by or used by the board, and were made at a time it was understood under the original contract that no services should be performed.

Under the above record it is clear that Page Bros.' right to recover must depend upon the validity of their original contract. If the original contract was void there is no merit in their suit based on the recovery sought for the $2,000 for work done on the plans for the high school building before the money was available, as it was understood that no work was to be done for this building until the bonds therefor were sold and the money available. The district did not order this work done, did not receive it, and derived no benefit therefrom.

The district admits its liability for the $426.24, and no issue is made as to the correctness of the district court's judgment to that extent.

■ Page Bros. contended in the trial court and in the Court of Civil Appeals, and now contend, that the original contract was valid; that they were wrongfully discharged; and that they are therefore entitled to recover from the district their damages for the breach of the contract by the district. The measure of damages sought is the profit Page Bros. would have made had they been allowed to complete the contract, and the profit is alleged to be the difference between the contract price of their services and the expense they would have incurred in rendering the same. This is the correct measure if the contract as originally made is valid.

■ The district contends that the original contract is void because under the statutes of this state the school board had no authority to contract with reference to the schoolhouse bond funds until the bonds were actually voted, issued, sold, and the proceeds thereof avail-

able. In connection with the above contention it is further contended by the district that since the contract is without authority of law, it can form no basis for a valid claim against the district because it is provided by section 53, article 3, of our State Constitution, that: "The legislature shall have no power to grant, or to authorize any county or municipal authority to grant, * * * nor pay, nor authorize the payment of, any claim created against any county or municipality of the state, under any agreement or contract, made without authority of law."

We think an independent school district is a municipality within the meaning of the above constitutional provision. We are therefore left to determine but one question, which is: Was the contract made the basis of this suit entered into without authority of law?

▆▆ Independent school districts such as the one here involved are authorized and provided for under the Constitution and laws of this state. Furthermore, such districts are municipalities with the powers conferred on them by law. Such districts are governed by a board of seven trustees, and such board only possesses the powers expressly conferred on it by law or necessarily implied from the powers so conferred. These rules are elementary. It therefore becomes necessary for us to examine the pertinent statutes of this state to ascertain whether they, by express provision or necessary implication, authorize the contract made the basis of this suit at the time and under the conditions here involved. Of course, the school board has general powers to contract for the building of schoolhouses and expend bond funds therefor. This power would carry with it the right to employ architects to design and supervise the construction of such buildings.

The school board is a body corporate, and as such may contract and be contracted with, sue and be sued. Article 2748, R. C. S. 1925. The board of trustees of independent school districts are vested with all the rights, powers, and privileges and duties conferred and imposed by law upon the trustees and boards of trustees of independent school districts. Article 2758, R. C. S. 1925, as amended by Acts 1927, 40th Leg. p. 353, c. 238, § 2. We here call attention to the fact that the 1927 act amends article 2758 of the 1925 Codification in several important details. In this connection we call attention to the fact that the original article conferred upon the board of trustees of an independent school district the same authority as regards the establishment and maintenance of free schools, etc., that is conferred upon the governing bodies of incorporated cities and towns. The amendment by the 40th Legislature, supra, which was in force when this contract was made, merely gives the authority conferred by law upon independent school districts. It is therefore evident that we must look to the several pertinent statutes relating to school districts to ascertain the powers of independent school boards to contract in reference to the bond funds of the district.

The state and county available school funds are limited in their uses to the payment of teachers' and superintendents' salaries, fees for the taking of the scholastic census, and interest on money borrowed on short time to pay salaries of teachers and superintendents when these salaries become due before the school funds for the current year become available. The loans can only be paid out of funds available for the current year. Subdivision 1, article 2827.

Local school funds, that is, funds not derived from the state and county, may be used: (a) For the purposes for which state and county funds may be used; (b) for purchasing appliances and supplies; (c) for the payment of insurance premiums, janitors, and other employees; (d) for buying sites, buying, building and repairing, and renting schoolhouses; and (e) other purposes necessary to conduct the public schools to be determined by the board of trustees. Subdivision 2, article 2827.

Where the state and county available fund is sufficient to maintain the schools for at least eight months and leave a surplus, such surplus may be expended by the board in the same manner as local funds. Subdivision 2, article 2827.

▆ From the above it is evident that the powers of the school board to expend the funds of the district are at all times limited to an available fund, and to the particular thing prescribed by the statute. The board never has any authority to expend funds that are not available.

The board of trustees of independent school districts has the power to levy and cause to be collected annual taxes, and to issue bonds for schoolhouse purposes. Also it is provided that no tax shall ever be levied, collected, abrogated, diminished, or increased, and no bonds shall ever be issued until such action shall have been authorized by a majority of the votes cast at an election held in the district for such purposes, at which none but property taxpaying, qualified voters shall participate. Article 2784. It is then provided how elections for taxes and bonds shall be ordered and held and the results declared. If the election is for an independent school district, it is ordered by and the returns made to the local school board, and such board declares the result. Article 2785. There are then provided certain things which shall be done in ordering elections for the issuance of bonds, the maximum rate of interest they shall bear, the time they shall run, and that such bonds shall be approved by the Attorney General and registered by the comptrol-

ler. The statute then provides: "All bonds shall be sold to the highest bidder for not less than their par value, and the proceeds of such sale shall be deposited in the county depository for the common school districts, and in the district depository for the independent school districts, to the credit of such districts, and shall be disbursed only for the purpose for which said bonds were issued, on warrants issued by the district trustees and approved by the county superintendent for common school districts, and by the president of the board of trustees and countersigned by the secretary of said board for independent districts." Article 2786.

The above article has been amended by the 41st Legislature (1st Called Sess., c. 43), but the amendment was not in force at the time this contract was made. At any rate, the amendment does not affect this case.

It is also provided: "When said bonds have been duly approved and registered, they shall continue in the custody of and under the control of said board and shall be sold by said board for cash, either in whole or in parcels." Article 2788.

The statutes then expressly provide that more than two years after a local tax has been voted in any school district the voters may abrogate or diminish the amount of the tax, and the statute further expressly provides: "* * * provided, however, that no change or modification in such maintenance tax shall ever affect any bond tax authorized by such district." Article 2790.

█ We think the above are all the statutes that are pertinent to the case at bar. The issue here is whether the above statutes will authorize, directly or by implication, the school board to make a contract involving the expenditure of schoolhouse bond funds before such bonds are even authorized by vote of the qualified taxpaying voters of the district, where the contract is conditioned on the bonds being voted, issued, and the proceeds available, and it is understood that no work is to be done and no money due until the bonds are voted, sold, and the money actually available. We find that this question has been before several of the Courts of Civil Appeals, but never before the Supreme Court. Bone v. Black (Tex. Civ. App.) 174 S. W. 971, 973; Board of Trustees of Alpine Independent School District v. Jacobs (Tex. Civ. App.) 170 S. W. 795.

In Bone v. Black, supra, the Court of Civil Appeals at Amarillo had before it a case where the Roaring Springs independent school district had voted $17,000 worth of bonds for the purpose of erecting a schoolhouse. These bonds had been issued, approved by the Attorney General, and registered by the comptroller, but had not been sold and the money was not available. In this condition of affairs, the board made a contract with a building contractor to build the schoolhouse. The contract expressly provided that the work should not begin until the bonds were sold and the money available. The opinion shows that other issues and questions were involved, but this is a sufficient statement of the case to understand the ruling of the Court of Civil Appeals on the validity of the contract. In passing on the right of the board to make the above contract, the Court of Civil Appeals, speaking through Judge Huff, reviewed the several statutes and constitutional provisions at great length, and approved the holding in Board of Trustees of Alpine Independent School District v. Jacobs, supra, wherein it was directly held: "It is clearly contemplated in the law cited that the contract shall be made after the bonds shall have been issued and sold, and that the money arising from such sale shall be disbursed only to satisfy and meet such contracts."

In Bone v. Black, supra, Judge Huff particularly calls attention to the wording of the several statutes relating to the right of trustees to expend bond funds, and then calls particular attention to the wording of section 3, article 7, of our Constitution, which gives the district the right to vote taxes to issue bonds and finally reaches the conclusion that the board is without jurisdiction to contract with reference to such bond funds until the money is actually available. We quote the following from the opinion:

"It is manifest from a reading of the statutes that it was the intention of the Legislature not to confer any power upon the trustees to contract and to create an obligation against the district until funds are available. At what point, if this is not a correct proposition, will the trustees be vested with power? Certainly not before the petition presented for an election, or before a vote authorizing the tax. It could not be before the bonds are approved and registered by the comptroller. It takes all these to make a valid bond. When this is done, there is nothing to pay the amount due on the contract. The bonds must be sold, and the money in the treasury. When that is done, the trustees may contract. Up to that time they are not vested with authority to contract for the building.

"Article 2842 indicates that until the bonds are sold the taxes levied to pay them may be discontinued by vote. If before they are sold the tax should be discontinued, the bond will be valueless. Hence a contract before they are sold does not bind the fund. There is no power in the trustees to give bonds for the building. They must be sold, and the money placed in the treasury, and drawn out upon the proper order. The trustees have no power or authority over these bonds until they are sold. No discretion is vested in them when they shall contract. It must be done when the money is in the treasury for that purpose, or is available; otherwise, they can

create no obligation against the district. We think it is a general rule 'that such contract can be entered into, only to the extent of 'funds provided and available for that purpose,' by trustees. 35 Cyc. 951, 952 (A) note 97."

It seems that no writ was applied for in the above case.

In Board of Trustees of Alpine Independent School District v. Jacobs, supra, the Court of Civil Appeals at San Antonio had before it a case where the district was sued by an architect for the agreed price of certain plans and specifications made by the architect to be used in building a schoolhouse. The district answered and set up the fact that it was agreed that the money to pay for the plans and specifications was to be raised from the sale of certain bonds which had been voted, but which proved to be illegal, and no money was ever derived therefrom. The suit was on the contract. Other matters were involved not pertinent here. In this state of the record, the court, speaking through Judge Fly, held the contract illegal and held as quoted in the opinion in Bone v. Black, supra.

In the case at bar it must be borne in mind that the right of Page Bros. to recover except for the $426.24 depends on the validity of the original contract, and we are of the opinion that the board was without power to bind the proceeds of the bond fund to be derived from bonds not even voted at the time the contract was made. Certainly there is no direct authorization for such a contract, and we are unable to say that it should be held that the authority is implied from the direct powers given. All of the statutes which confer power to expend bond funds limit the power to funds that are available, and from all of the statutes and constitutional provisions above mentioned, we are compelled to the conclusion that it was not the intention of the Legislature to permit the board to contract with reference to such funds unless and until they are actually available, and certainly there is far less reason to hold that such a contract should be upheld when made at a time when the bonds are not even voted and when the taxable values will not even sustain the amount contemplated.

The Court of Civil Appeals cites in support of its holding that the instant contract is valid the cases of City of Houston v. Glover, 40 Tex. Civ. App. 177, 89 S. W. 425, and City of Houston v. Potter, 41 Tex. Civ. App. 381, 91 S. W. 389. Both of these opinions are by the Court of Civil Appeals at Galveston.

In the Glover Case, supra, it was held that the agreement of the city to pay an architect an agreed sum out of the current revenues of the city for preparing plans for repairing the city hall was a valid contract and not in violation of sections 5 and 7 of article 11 of our State Constitution. These last-mentioned constitutional provisions prohibit the creation of a debt by counties and cities unless at the time the debt is created a tax is levied to pay the same. As we understand this record, it is not even contended by the district that these constitutional provisions have any bearing on the issues of this case.

The Potter Case, supra, involved a contract between the City of Houston and one Potter wherein Potter was employed to superintend the construction of a system of sanitary sewerage for the city, and the issues involved are entirely foreign to the issues of this case.

We recommend that the judgment of the Court of Civil Appeals and the district court be both reversed and judgment here rendered for Page Bros. for the $426.24 with interest from April 1, 1926, the date of the district court judgment. We recommend further that the district pay all costs in the district court, and that Page Bros. pay all costs of appeal in all courts.

CURETON, C. J.

The judgments of the district court and Court of Civil Appeals are both reversed, and judgment rendered for the defendants in error for $426.24 and interest, as recommended by the Commission of Appeals.