### SCOFIELD ENGINEERING CO. v. CITY OF DANVILLE.

#### No. 3750.

District Court, W. D. Virginia, at Danville.

Nov. 23, 1940.

John W. Carter, Jr., of Danville, Va., for plaintiff.

E. Walton Brown, of Danville, Va., for defendant.

BARKSDALE, District Judge.

This case comes before me on defendant's motion for a judgment on plaintiff's amended complaint and defendant's answer thereto, under Rule 12(c) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Defendant also filed a counterclaim and plaintiff replied thereto, denying the allegations thereof.

The facts, as shown by the pleadings, briefly are:

In the spring of 1933, the City of Danville desired to construct a hydro-electric power plant at the Pinnacles of the Dan in Patrick County, Virginia, to be operated by the municipality for the purpose of supplying electric power to the City of Danville, and its citizens. The City contemplated financing the project by obtaining a loan from the Reconstruction Finance Corporation and issuing its bonds

for the balance of the money required. Plaintiff, a Pennsylvania corporation engaged in engineering, was invited by the City to prepare the necessary engineering data for filing an application for a loan from the Reconstruction Finance Corporation for this project, the City officials representing to the plaintiff that in the event the plant was constructed, plaintiff would be employed as consulting engineers for the project. After some negotiations, an agreement was reached between the plaintiff and defendant, which was embodied in a resolution adopted by the Council of the City of Danville on May 10, 1933, which in effect recites an agreement to pay the plaintiff the sum of $3,000 for the preparation of the necessary engineering data for the City's loan application, and an employment of the plaintiff at an agreed compensation, as consulting engineers for the project "should the proposed loan be made by the Reconstruction Finance Corporation to the City of Danville and the proposed development carried out."

The engineering data was obtained and formulated by the plaintiff, the City's application was filed, first with the Reconstruction Finance Corporation, and later transferred to the Public Works Administration, the same engineering data being used and the plaintiff continuing to render engineering services in connection with the application. On January 12, 1934, the Public Works Administration approved a loan and grant to the City of Danville for this project in the sum of $3,000,000, of which 30 per cent was to be a grant, and 70 per cent a loan to be evidenced by the bonds of the City of Danville.

It was understood by both plaintiff and defendant, at the inception of their relationship in this regard and throughout the transaction, that issuance of revenue bonds of the City of Danville was contemplated and was necessary for the financing of the project.

The Charter of the City of Danville provides that: "2. Except as otherwise provided in this chapter, no bonds of the City of Danville shall be issued until the question of issuing them shall have first been submitted to the qualified voters of the city at a general or special election and shall have been approved by two-thirds of such voters voting on the question of such issue, which two-thirds shall include a majority of the qualified registered voters owning real estate in said city and voting in such election on the question of such issue. * * *"

An Act of the General Assembly of Virginia, approved September 7, 1933 (Acts of Assembly 1933, Ex.Sess., chapter 26, page 47), to facilitate the acceptance of grants and the making of contracts with the Public Works Administration under the National Industrial Recovery Act of Congress, provided in Section 14 that: "Provided, however, that in the cities of Roanoke and Danville no money shall be borrowed and no bonds issued and no indebtedness incurred hereunder until and unless the proposal so to do shall have been submitted to the qualified voters of such city at a special election and approved by a majority of the qualified voters who vote in said special election."

It is not necessary here to consider whether or not the Act of Assembly just referred to amended the Charter of the City of Danville, and if so, to what extent. At any rate, an election was a prerequisite to the issuance of revenue bonds for this project by the City of Danville.

On February 26, 1934, an election was held in the City of Danville, at which the proposal to accept the proposed loan and grant from the Public Works Administration, issue the City's revenue bonds in the amount necessary for the City to avail itself of the loan and grant, and construct the hydro-electric development, was submitted to the voters, and a majority of the voters who participated therein voted *against* the issuance of said bonds.

Thereafter, the plaintiff was at all times ready, willing and able to perform engineering services for the City pursuant to its contract, but these services were not availed of, and in July 1934 a citizens' committee procured an appropriation of $2,000 out of current revenue from the City Council and employed another engineering firm, Charles T. Main, Inc., of Boston, to investigate the situation and make recommendations. After the report of said Charles T. Main, Inc., the City renewed its application for a loan and grant, and this time received from the Public Works Administration an offer of a loan and grant of $2,750,909, of which 45 per cent was to be a grant and 55 per cent to be a loan. The proposal to accept this offer, issue the City's revenue bonds in the necessary amount and to construct the hydro-electric development, was submitted to the people at an election on October 1, 1935, at which

election the proposal was approved, and thereafter the City proceeded to issue its revenue bonds, secure the 45 per cent grant from the Public Works Administration, and construct the project under the supervision of Charles T. Main, Inc., as supervising engineers.

The plaintiff alleges that it was willing and able to act as consulting engineers in the development of the project, and that the City was bound by its contract of May 10, 1933, to avail itself of such services, and the City's failure so to do constituted a breach of contract, for which the City is liable in damages. Upon the City's refusal to pay, this suit was instituted.

The City bases its motion for a judgment on the pleadings primarily upon the grounds:

(1) That under the law the Council of the City of Danville had no right or power to contract to spend any portion of the avails of the contemplated loan until after the issuance of the bonds had been authorized by the voters of the City of Danville in an election as required by its Charter and the statute (Acts of Assembly 1933, Ex.Sess., c. 26, p. 47); and

(2) That if the contract of May 10, 1933, was valid, it was conditioned upon the approval of the proposition then under consideration by the voters at a special election, and that inasmuch as that proposal was disapproved by the vote of the people in the election of February 26, 1934, the occurrence of the condition precedent to the validity of the contract failed, and therefore the contract was rendered void and of no effect for all time by the failure of the proposal to carry at the election of February 26, 1934.

The plaintiff contends that the City Council did have the power to make a contract involving the expenditure of the proceeds of the bond issue before approval of such bonds by an election, provided that such expenditure was conditioned upon subsequent approval in an election, and further that, even if the City is not liable to it upon the express contract, it is liable on a quantum meruit upon the implied contract.

It is conceded by counsel that the charter and statutory inhibition against the issuance of bonds is equivalent to an inhibition against incurring indebtedness, in that it was understood by both parties that this project must necessarily be financed out of the proceeds of a bond issue.

■ I am definitely of the opinion that any indebtedness incurred by a municipality in contravention of statutory or constitutional limitations is void. State v. Pullman, 23 Wash. 583, 63 P. 265, 83 Am.St. Rep. 836; Byrns v. City of Moscow, 21 Idaho 398, 121 P. 1034; Keller v. Scranton, 200 Pa. 130, 49 A. 781, 86 Am.St.Rep. 708; Uhler v. Olympia, 87 Wash. 1, 151 P. 117, 152 P. 998; Sanders v. Gainesville, 141 Ga. 441, 81 S.E. 215; Cameron County, etc., v. De La Vergne Engine Co., 5 Cir., 93 F.2d 373; Hamlin v. Brown-Crummer Inv. Co., 5 Cir., 93 F.2d 680.

■ I am also definitely of the opinion that if the municipal indebtedness incurred is in contravention of constitutional or statutory limitations, there can be no recovery on implied contract for a quantum meruit. To support his contention that the plaintiff can here recover on implied contract, plaintiff's counsel relies on Mount Jackson v. Nelson, 151 Va. 396, 145 S.E. 355, and Leonard v. Waynesboro, 169 Va. 376, 193 S.E. 503. In these two cases, the court does approve the "unjust enrichment" doctrine, but in my opinion they are distinguishable from the instant case and are not controlling.

In Mount Jackson v. Nelson, supra, the town entered into a contract with plaintiffs, providing that if plaintiffs would build a pipe line, large enough to supply plaintiffs and other prospective customers, from the town's water supply line to plaintiffs' place of business beyond the corporate limits of the town, the town would pay for the construction of the water line and furnish plaintiffs with water. Such a line was built, and thereafter the town refused to pay for the line or to supply water. The court held that in some respects the contract to supply water was ultra vires, but that it was within the power of the town to sell excess water to customers beyond its corporate limits and to incur reasonable expense for the construction of pipe lines necessary for the disposal of such excess. Therefore, the court held that plaintiffs were entitled to recover the cost of the construction of the pipe line under the contract. The court, however, recognized the "unjust enrichment" doctrine by the following observation [151 Va. 396, 145 S.E. 358]: "If this entire contract were ultra vires, plaintiffs could still recover on a quantum meruit. The town has retained and controls this main designed for the benefit of consumers generally and through

672

which they can deliver water at a profit. In such circumstances, the obligation to pay is as complete as it would be to pay for a right of way bought and held for this pipe. No one would claim that it could keep such an easement and not pay for it."

It is to be carefully noted, however, that the court in this case was dealing with a contract for the expenditure of money, not in violation of any statutory inhibition or limitation.

In the case of Leonard v. Waynesboro, supra, the court was dealing with the case where a contract could have been lawfully made, but in which no contract was actually entered into. In this situation, the court held that there was the implied obligation on the town to pay for the pipe line, which had been built at the plaintiff's expense and later taken over by the town for general use. The court, however, in thus applying the doctrine of "unjust enrichment", recognized its limitations as follows [169 Va. 376, 193 S.E. 506]:

"The principle under which a municipality is held liable upon an implied contract for labor and materials is nowhere better stated than by the Supreme Court of Appeals of our sister state, West Virginia. In Cade v. City of Belington, 82 W.Va. 613, 96 S.E. 1053, the court used this language in a syllabus prepared by it: 'As a general rule, a municipal corporation is not bound by a contract made without corporate action by the council, duly assembled, manifested by an order entered of record in the minute book containing a notation of its proceedings.

"'But if the municipality has power to contract therefor by express contract, and the contract is not against public policy, and there are no statutory or charter provisions limiting the mode of execution of a like express contract, it will be liable on an implied contract where, with the knowledge and consent, express or implied, of the members of the council, it has received benefits rendered at the instance and request of its duly authorized agents acting for and on its behalf, either in the absence of any contract or where the express contract is invalid because of mere irregularities.'" (Italics mine).

The case of Bristol v. Dominion National Bank, 153 Va. 71, 149 S.E. 632, is in my opinion more nearly in point. In that case (153 Va. at page 82, 149 S.E. 632, at page 636), it is said that before the law will supply an obligation to pay on the ground of unjust enrichment as a quasi contract, it is necessary that the express contract set aside must not have been against public policy, and not expressly prohibited by the charter or by statute. And further, the opinion cites McQuillan on Municipal Corporations, 2d Ed., vol. 3, p. 820, to the effect that—"it is doubtful if there are any cases which hold that when a contract is in a class expressly prohibited by charter or statute the acceptance of benefits raises an implied obligation."

Therefore, it seems clear to me that if the contract here sued on did create an indebtedness inhibited by statute, there can be no recovery on the basis of implied contract or upon the theory of unjust enrichment. See, also, Wakely v. St. Louis County, 184 Minn. 613, 240 N.W. 103, 84 A.L.R. 920; Lumbermen's Trust Co. v. Ryegate, 9 Cir., 61 F.2d 14; Perry, etc., Co. v. City of Perry, 29 Okl. 593, 120 P. 582, 39 L.R.A.,N.S., 72; City of Fort Pierce v. Scofield Engineering Co., 5 Cir., 57 F.2d 1026; Berlin Iron Bridge Co. v. San Antonio, C.C., 62 F. 882; Greenburg Iron Co. v. Abbeville, 5 Cir., 2 F.2d 559.

But plaintiff contends that no actual present indebtedness was created by the contract of May 10, 1933, because the contract was conditioned upon the issuance of bonds and the development of the project by the City, and that therefore the contract was not in violation of the charter and statute, and became binding on both parties upon the happening of the conditions precedent.

No authority bearing directly on this precise point has been cited to me by counsel for either party. There may be other authority, but I only find that this precise question has been considered by the courts of Texas. The case most closely in point seems to be Harlingen Independent School District v. C. H. Page & Bro., Tex.Com. App., 48 S.W.2d 983. In this case, the School District contemplated a considerable building program, to be financed out of the proceeds of a bond issue. A bond issue election was ordered on September 23, 1927, to be held on October 22, 1927. On October 10, 1927 (before the election had been held), the School Board employed plaintiffs as architects at an agreed compensation for the entire work. It was understood by both parties that the election had not been held and that the contract was conditioned on a favorable election, and that no services were to be ren-

dered by the architects and no money paid to them unless and until the bonds were voted and sold and the money actually available to the District. The election was favorable to the bond issue, and thereafter several school buildings were erected, with the plaintiffs acting as architects, and the School Board paid a part of the agreed compensation therefor and admitted its liability for the balance due on these projects. However, after the bond issue therefor had been approved, but before the bonds were issued or sold for the erection of a high school, the personnel of the School Board changed and the new board repudiated its further obligation to plaintiffs and employed other architects for the high school building. Thereafter the bonds to cover the cost of the high school were issued, sold, and the money made available, and the construction of the high school commenced under the supervision of the other architects. The services of plaintiffs had been satisfactory, and at the time of their discharge they had done some $2,000 worth of work on the plans for the contemplated high school building, which work, however, had not been officially ordered by the School Board. Plaintiffs sued the School District for damages growing out of this alleged breach of contract, contending that the School Board was bound to avail itself of their services for the erection of the high school building.

Texas statutes provided that no bonds should be issued until an election had been held approving them, and that after approval bonds must be sold to the highest bidder and the proceeds deposited in the county depository and disbursed only for the purpose for which said bonds were issued.

The court said (48 S.W.2d at page 987): "The issue here is whether the above statutes will authorize, directly or by implication, the school board to make a contract involving the expenditure of school house bond funds before such bonds are even authorized by a vote of the qualified taxpaying voters of the district, where the contract is conditioned on the bonds being voted, issued, and the proceeds available, and it is understood that no work is to be done and no money due until the bonds are voted, sold, and the money actually available."

Quoting from Board of Trustees of Alpine Independent District v. Jacob, Tex.

Civ.App., 170 S.W. 795, the court further said: "It is clearly contemplated in the law cited that the contracts shall be made after the bonds shall have been issued and sold, and that the money arising from such sale shall be disbursed only to satisfy and meet such contracts."

Further quoting from Bone v. Black, Tex.Civ.App., 174 S.W. 971, the court said: "It is manifest from a reading of the statutes that it was the intention of the Legislature not to confer any power upon the trustees to contract and to create an obligation against the district until funds are available. At what point, if this is not a correct proposition, will the trustees be vested with power? Certainly not before the petition presented for an election, or before a vote authorizing the tax. It could not be before the bonds are approved and registered by the comptroller. It takes all these to make a valid bond. When this is done, there is nothing to pay the amount due on the contract. The bonds must be sold, and the money in the treasury. When that is done, the trustees may contract. Up to that time they are not vested with authority to contract for the building."

In holding the contract invalid, the court said (48 S.W.2d at page 988): "All of the statutes which confer power to expend bond funds limit the power to funds that are available, and from all of the statutes and constitutional provisions above mentioned, we are compelled to the conclusion that it was not the intention of the Legislature to permit the board to contract with reference to such funds unless and until they are actually available, and certainly there is far less reason to hold that such a contract should be upheld when made at a time when the bonds are not even voted and when the taxable values will not even sustain the amount contemplated."

The case of W. L. Pearson & Co. v. Hutchinson County, Tex.Civ.App., 52 S.W. 2d 509, 515, distinguishes the doctrine of the Harlingen County case, supra, where the contract has been fully performed. Pearson and the county entered into a contract for certain road construction before the required election was held, with the understanding that the work would not be done until the money was made available. The election was held, the bond issue was approved, and the work was fully completed by Pearson and paid for by the county. Thereafter, the county sued to re-

cover the money paid, upon several grounds, one of which was that the contract was in contravention of law and exceeded the powers of the county. The court said: "It is inferable from the record that it was in contemplation of the parties to raise such funds from the proceeds of a bond issue to be immediately submitted to a vote of the people of Hutchinson county. This was done and the funds thus made available. We have, therefore, read into the transaction a conditional bid with an unconditional acceptance within a reasonable time thereafter by the county. If this conclusion is correct, it may be admitted that at the moment of making the original so-called contract between the parties, it was in violation of the constitutional provision quoted in the original opinion, and this without affecting the final conclusion we reach. In other words, no binding contract resulted until funds were made available in the manner pointed out above. Hence, no debt was created until then."

And again, on page 516 of 52 S.W.2d, the court said: "We construe the bids as a mere offer to pave the roads of Hutchinson county, which offer Hutchinson county in a short time accepted. We would have here an entirely different case if Hutchinson county had refused to go forward with the contract before any bond issue was voted and sold and any work done and accepted under the original bid."

This opinion differentiates the Harlingen case upon the theory that, even though the conditional contract was invalid when entered into, it should be construed as an offer to perform services, and if, as and when funds are legally available, and the offer accepted and the work done, a valid contract comes into being when, after funds have been legally made available, the offer to perform services is accepted and the services actually performed.

The later case of Eldorado Independent School District v. Becker, Tex. Civ. App., 120 S.W.2d 476, at page 477, restates that proposition as follows: "Even though no funds were actually available at the time the school board entered into its contract with appellee, it is clear that it was merely conditional at that time in contemplation of and dependent upon bonds being voted, a sale thereof, and the erection of said building. It cannot be said, therefore, that a debt was created against the school district until these conditions had transpired. And when all of these conditions had come to pass, the moneys made available, and the contract fully executed, clearly it became a valid charge against the funds legally provided to discharge it."

 I am disposed to follow the principles of the Texas cases cited above, so far as applicable to the situation here presented. The City of Danville, a municipal corporation, has only such powers as are granted to it by statute. No express power to make such a contract as here sued on has been pointed out to me. On the other hand, the City is expressly inhibited from issuing bonds or expending their proceeds until such action has been approved by a vote of the people. It is said that the contract here sued on is conditional and. does not create a present indebtedness against the funds arising from the bond issue. It is true that in one respect it is conditional, but the only conditions are the issuance of bonds for the project and the development of the project. If the project is developed, the conditions are obliged to occur, and so far as this project is concerned, the happening of the conditions precedent is inevitable, and the city would be absolutely bound if the contract was valid and the project was developed. This seems to me to contravene the charter and the statute, and I therefore am of the opinion that the contract was invalid.

I have already indicated that I am of the opinion that if the contract is invalid as being in contravention of the charter and the statute, there can be no obligation upon the City on the theory of implied contract.

 And I am of opinion that plaintiff must fail on another ground, and that is, that even if its contract, conditioned upon a favorable election and the development of the project, were valid, it failed and became void and of no further effect when in the election of February 26, 1934, the bond issue proposal then in contemplation was defeated.

It seems that after this election little, if anything, was done in connection with the hydro-electric development until a citizens' committee procured an appropriation from the Council in July, 1934, and employed another engineering firm to investigate the situation and make recommendations. Based upon this report of the other engineering firm, the city renewed its application for federal funds, and after favorable action on this application the

subsequent election was held and the proposal was approved. When the parties here entered into the contract of May 10, 1933, they had in contemplation the application presently to be prepared by the plaintiff, and the bond issue election which would follow favorable action on this application. It seems to me that in any event the contract between the parties here would be limited to the situation in contemplation by the parties and covered by their contract. It does not seem that it would be reasonable to hold that by this contract the city bound itself for all time to employ the plaintiff as consulting engineers if it ever developed a hydro-electric project at the Pinnacles of the Dan with federal funds and the proceeds of a bond issue.

The recent case of Royer v. Board of Supervisors of Albemarle County, Va., Oct. 14, 1940, 10 S.E.2d 876, 879, supports this conclusion. There plaintiff, an engineer, entered into a contract with defendant on October 31, 1935, providing that he do the engineering work necessary for filing an application for federal funds, for an agreed compensation, and in the event of favorable action on the application and the acceptance of the proposal by the board, the plaintiff agreed to furnish complete plans and specifications, for an agreed fee. An election held some time in 1936 (the exact date does not appear in the opinion) resulted in a majority vote against the bond issue. Also the application for the grant then failed of approval because the federal funds available for projects of this nature had been exhausted. However, the county's application for funds remained on file with the Public Works Administration, and on June 28, 1938, after additional funds had become available, this federal agency notified the county that it was prepared to provide the necessary funds for the project. The Board of Supervisors accepted this offer and an election was called. Pending the election, plaintiff proceeded to prepare plans and specifications for the project. An election was held, at which a majority voted for the project. This election, however, was held void by the court, and a subsequent election resulted in a vote unfavorable to the project. The court held that the plaintiff could not recover on his contract for his services in the preparation of plans and specifications, because it was conditioned upon a contingency which never occurred, but the court also based its holding that

the plaintiff could not recover, upon the ground that his contract terminated when the application first failed of approval. The court said:

"It is true that in 1935 the Board of Supervisors employed the plaintiff to file an application for a federal grant and agreed that, in the event the application was approved and the offer of the government to assist in financing the project was accepted by the board, the latter would pay him for preparing and furnishing the necessary plans and specifications. The application was prepared and filed and the plaintiff was paid the agreed sum of $175 for this work. But because of the lack of funds the government did not approve the application.

"Moreover, since the bond issue was not approved by the voters of the Sanitary District the board was not in a position to have accepted the grant even if its application had been approved.

"Therefore, the stated contingency upon which the plaintiff had a right to proceed with the preparation of the plans and specifications had not occurred.

"While the grant was approved in June, 1938, on the original application filed some three years previous, this might have occurred after the lapse of even a longer period. *It does not make sense to say that under these circumstances the parties remained mutually obligated so that if at any time thereafter a federal grant had been secured and accepted the board would have been bound to have employed the plaintiff and the latter would have been bound to have done the work.* [Italics mine].

"It is clear, we think, that from the time of the refusal of the grant in 1936 until July, 1938, the plaintiff had no claim on the board and the latter had no claim on him. The original negotiations between the parties were terminated."

Therefore, it is my conclusion that defendant's motion for judgment on the complaint and answer must be granted.

Now, as to defendant's counterclaim:

Defendant alleges that its counterclaim is based upon the failure of the plaintiff, in furnishing the engineering data for the city's original application for a loan, to furnish reasonably accurate data and give sound and expert advice, and that plaintiff was thereby grossly negligent and misled the City of Danville to its damage, in

its construction and development of the hydro-electric project.

Plaintiff's reply to this counterclaim is a categorical denial of all its allegations. Such denial raises only an issue of fact. Naturally, plaintiff has not moved for a judgment in its favor on the counterclaim, on the ground of the absence of any contractual obligation, because plaintiff relies primarily on contractual obligation as the basis of its suit. But, as all the pleadings are before me, I consider it proper to consider the legal efficacy of the counterclaim in the light of the conclusion I have reached that the contract alleged by the plaintiff is invalid.

In the view I take of the case, the plaintiff was never legally employed by defendant to act as consulting engineers or to prepare actual working plans for the development of the project; the plaintiff having been employed solely for the preparation of data, drawings and estimates requested for the presentation of the loan application of the City of Danville to the Reconstruction Finance Corporation. It would seem obvious that such data, drawings and estimates were not intended for actual construction purposes, and were not so considered by either plaintiff or defendant. I have held that the plaintiff was never legally employed to do anything beyond the preparation of the data, drawings and estimates for the loan application, that the defendant was not obligated to pay for any further services, nor was the plaintiff obligated to perform any further services. Therefore, if the city used and relied upon the loan application data, drawings and estimates furnished by the plaintiff, for actual construction purposes, the city's use thereof was gratuitous, for a different purpose than that intended, and therefore the plaintiff would not be liable for negligent inaccuracies therein. Of course, if the plaintiff had been obligated by contract to furnish construction plans and specifications, and had been negligent in furnishing such plans and specifications, to the damage of the defendant, it would be liable, but, as I have held that there was no such contractual obligation, I am of opinion that the city's counterclaim must fail along with plaintiff's complaint.

Therefore, an order will be entered dismissing both plaintiff's complaint and defendant's counterclaim.