**John BALLOU, Appellee,**

v.

**Edward BOOKER, Superintendent, Virginia State Penitentiary, Appellant.**

**No. 85–6085.**

United States Court of Appeals, Fourth Circuit.

Argued July 17, 1985.

Decided Nov. 20, 1985.

Linwood T. Wells, Jr., Asst. Atty. Gen. (Gerald L. Baliles, Atty. Gen., of Va., Richmond, Va., on brief), for appellant.

Michael C. Allen (Englisby, Barnes & Allen, Chesterfield, Va., on brief), for appellee.

Before HALL, SPROUSE, and WILKINSON, Circuit Judges.

KENNETH K. HALL, Circuit Judge:

Edward Booker, Superintendent of the Virginia State Penitentiary, ("the Commonwealth")[1] appeals from an order of the United States magistrate granting John Ballou's petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. We reverse.

### I.

Ballou was arrested on October 12, 1975, and charged with raping an eleven-year old girl. In her statement given to the police, the victim said that on October 11, 1975, she went with petitioner to his house and looked at his cats and crafts. She stated that Ballou told her that he wanted to show her something in the rear of the house. According to the child, when she went back into the bedroom, petitioner took off all of

---

1. Appellant is referred to in both parties' briefs as "the Commonwealth." For the purposes of this opinion, appellant will also be called "the Commonwealth."

her clothes, picked her up, and put her on the bed. She said that Ballou then removed all of his clothes and got on the bed with her. The victim stated that Ballou inserted his penis inside her three times and that she felt fluid go into her body once or twice. Ballou informed the arresting police officers that he had attempted intercourse with the victim but had been unable to penetrate her.

Thereafter, Ballou's family hired Arthur E. Smith, a trial attorney with almost forty years' experience, to represent petitioner. Smith had previously represented Ballou in 1973, when petitioner had been accused of molesting several neighborhood children, a charge for which he was never prosecuted. As he had told the arresting officers, Ballou informed Smith that he had tried to have intercourse with the victim but had been unsuccessful. Smith was informed by the prosecutor that Ballou would either have to plead guilty to rape or face a jury on a plea of not guilty. Smith advised Ballou of these options.

By order of the court, Ballou was committed to a state hospital where he was evaluated to determine his competency to stand trial. It was determined that he was aware of his legal situation and the charges against him; that he showed an understanding of the legal issues and procedures in his case; that he understood the legal defenses available to him and the possible penalties; and that he was able to relate to counsel and to communicate with him in a meaningful manner. The report concluded that petitioner was "not psychotic and shoud [sic] be returned to the jurisdiction of [the] court for disposition of any matter pending against him." Subsequently, on February 9, 1976, petitioner pleaded guilty to rape. A sentencing hearing was held in July, 1976, after Ballou had undergone another psychiatric evaluation at his counsel's request. Petitioner was sentenced to fifty years' imprisonment.

Following denials of his petitions for habeas corpus relief in state circuit court and in the Supreme Court of Virginia, Ballou filed the present habeas corpus action in federal district court. He alleged, *inter alia*, that he had been denied his sixth amendment right to effective assistance of counsel. The parties consented to have the case referred to a United States magistrate, pursuant to 28 U.S.C. § 636(c)(1), and an evidentiary hearing was held on December 18, 1984.

At the time of the evidentiary hearing, Ballou, who has a seventh-grade education, was thirty-five years old. He testified that he was acquainted with the victim's parents, who operated a craft shop near his home. According to petitioner, on October 11, 1975, he encountered the child at her parents' craft shop, and she accompanied him from the craft shop to his home in order to look at his wife's craft work. Petitioner stated that while the two of them were alone in his home, the girl made sexual advances to him and that, when he refused to engage in sexual intercourse with her, she became angry and left the room. Ballou said that twenty minutes later he went into his bedroom to find the child manipulating herself. Petitioner testified that the girl then removed her clothes, but that he refused to undress himself.

Petitioner also testified that the day following the incident, he went to the home of the victim's parents, who then called the police. According to Ballou, they instructed him that he should tell the police he had merely attempted intercourse with their daughter but had been unable to penetrate her and that, when the police arrived, he so stated. The police then arrested him and charged him with rape.

Ballou testified further that his attorney, Smith, told him that pleading guilty was the best thing to do and that petitioner totally relied on counsel's advice. Ballou stated that, according to Smith, if he entered a guilty plea he would either be placed on probation or sentenced to a term of less than five years' imprisonment. Petitioner said he thought that if he followed his lawyer's advice he would "surely get probation and nothing more." Ballou admitted telling his trial counsel that he had unsuccessfully tried to have sexual inter-

course with the girl. He explained, however, at the hearing, that he was only repeating what the child's parents told him to say. He stated that he was unable to tell counsel the truth, because Smith was angry with him for telling the police that he had attempted intercourse. Petitioner testified that counsel never discussed with him his possible defenses or explained to him the elements of the offense.

Dr. Robert Showalter, who served as the senior clinician supervising the pre-sentence psychiatric evaluation, also testified at the evidentiary hearing. According to Dr. Showalter, Ballou has subnormal intelligence that is particularly manifested by a high degree of suggestability, which makes him "very easily led."

The evidence presented by petitioner at the hearing further revealed that the child whom Ballou was convicted of raping had a history of psychiatric, psychological, and emotional disturbances. A psychological evaluation performed in January, 1975, reported that she had a manipulative personality and was "an habitual liar." During the time period between Ballou's guilty plea and his sentencing, the girl was hospitalized for almost a month for psychiatric evaluation. Her treating psychiatrist, Dr. James Shield, testified at the evidentiary hearing that the victim had accused her father and brother of raping her—accusations which her family maintained were false.[2] Dr. Shield stated that, in his opinion, the child was severely obsessed sexually, and that her sexual obsession was a direct result of her rape by petitioner.

Frank M. Guilfoyle, M.D., the pediatrician who examined the victim on October 11, 1975, following the incident, was also a witness at Ballou's habeas hearing. Dr. Guilfoyle testified that in his present opinion the girl's genitalia were not penetrated and she was not raped. Dr. Guilfoyle based his opinion on the results of a physical recovery test laboratory analysis, which established that no spermatozoa were identified on the vaginal slides or on the girl's underwear and that no hairs were found in the pubic combings or on the underwear, together with his own examination of the child. He added that the genital irritation he found "was not very dramatic" and that, given the girl's young age, "there would have been much greater evidence of over-external injury."[3] Dr. Guilfoyle conceded upon cross-examination, however, that the absence of semen and pubic hair did not necessarily mean that penetration had not occurred, and that slight penetration could occur without any evidence of physical injury.

At the evidentiary hearing, Ballou's former attorney, Smith, testified on behalf of both petitioner and the Commonwealth. Smith testified that he had interviewed Ballou several times prior to trial and that during those interviews petitioner admitted that he had attempted to have sexual intercourse with the victim, but that he was unsuccessful because he could not "get it in." Counsel explained that he understood Ballou to mean that petitioner had been unable to have satisfactory sexual intercourse with the girl because he could not break her hymen. Smith further stated that he had obtained access to the victim's statement in which she accused Ballou of rape, and that he had questioned the police

2. The record does not reveal whether the victim accused her father and brother of raping her before or after the incident involving Ballou.

3. Dr. Guilfoyle testified that the redness he had discovered in the genital region of the girl's body was not sufficient to permit a professional conclusion that she had been raped and is a condition frequently seen in children, resulting from "their use of harsh soaps, bubble baths in particular, self-manipulation." He added that on two occasions the child had been treated for a similar genital irritation.

However, in a report to the prosecutor dated February 12, 1976, Dr. Guilfoyle reported that the victim's labia and introitus appeared to be reddened and irritated and noted "a mucoid secretion on the left thigh on its inner aspect." Although Dr. Guilfoyle noted that he had found no evidence of bleeding or bruises, he wrote that his findings, based on the history of the event as recited by the child, were compatible with sexual assault. He, therefore, referred the girl to a hospital where further examinations could be conducted to confirm whether a sexual act had in fact occurred.

officer who had interviewed her. He said he had obtained a copy of Dr. Guilfoyle's February 12, 1976, report concerning the girl's physical condition after the rape, *see supra* note 3, and he had reviewed the laboratory analysis of the test which the hospital had conducted for the presence of semen and pubic hair. Smith admitted that he did not personally interview the victim, and that he had contacted neither Dr. Guilfoyle nor the physician who treated the child at the hospital.

Smith testified that, at the request of the prosecutor, he agreed to waive a preliminary hearing. He said that he did so because he hoped to "curry some favor" with the prosecution and with the victim's family. Smith stated that his strategy was to create an atmosphere of cooperation by Ballou that would be conducive to a sentence of probation. Smith testified that, based upon petitioner's admissions to him and to several sheriff's deputies, he believed that, at the very least, Ballou would be convicted of attempted rape. Smith also expressed his belief that, based upon his experience and his knowledge of a recent case in which a local jury had sentenced a defendant to death for the rape of a young girl, petitioner, if tried by a jury, would receive a lengthy penitentiary sentence even if he were only convicted of attempted rape.[4]

Smith stated that, in light of a conversation which he had had with the trial judge, he was hopeful that Ballou would be placed on probation if he entered a plea of guilty.[5] Smith said that he so advised his client and Ballou's family, but he did not give them any assurances. According to Smith, he had also discussed with them the possibility of a defense based on a challenge to the victim's credibility. Although he could not specifically remember doing so, Smith stated that he felt certain he explained the elements of rape to petitioner, including the element of penetration. Smith testified that the final decision to plead guilty was made by Ballou after consulting with his family and counsel.

Ballou presented the testimony of two expert criminal defense attorneys, Robert G. Cabell, Jr. and Matthew N. Ott, at the evidentiary hearing. Both testified that Smith's representation of petitioner was ineffective, prejudicial and deprived Ballou of a fair trial. Both witnesses cited counsel's failure to investigate possible defenses, his failure to realize that the victim's credibility would be a principal issue at trial, and his decision to waive the preliminary hearing. Cabell asserted that Smith's advice to petitioner to plead guilty was ineffective in view of the favorable medical evidence and the incredibility of the girl's statement in light of the medical evidence. Both witnesses stated that counsel's failure to ensure that his client understood the various proceedings constituted deficient representation.

The magistrate determined that Smith failed to properly investigate the case, and that Ballou was prejudiced in that "there would have been a different outcome in all probability, under the Strickland versus Washington case."[6] The magistrate ordered a writ of habeas corpus to issue, and the Commonwealth appeals.

## II.

On appeal, the Commonwealth contends that Ballou was not denied effective assistance of counsel. We agree.

---

**4.** Even though the death penalty for rape had been abolished in Virginia at the time of Ballou's plea, petitioner still faced a possibly maximum sentence of life imprisonment.

**5.** Smith testified that he knew the trial judge well and that the trial judge was a long-standing personal friend of his. He said that sometime before trial, the trial judge suggested that if Ballou were going to plead guilty, counsel should consider sending him for a pre-sentence evaluation to determine "under what circum-

stances he would be available for probation." According to Smith, the judge told him about another rape case in which the defendant had been evaluated with respect to his propensity to repeat the crime and had received a favorable report. Smith stated that based upon the trial judge's suggestion that petitioner be evaluated, Smith believed that the trial judge was seriously considering putting Ballou on probation.

**6.** *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The standard established by *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), is that:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* 104 S.Ct. at 2064. We hold that under the *Strickland* standard, Smith's representation was not constitutionally deficient.[7]

*Strickland* makes clear that counsel's performance cannot be evaluated with the benefit of hindsight. As the Supreme Court stated:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id.* at 2065–66 (citation omitted).

In the instant case, Smith was fully aware of Ballou's history and mental limitations because of his prior representation of petitioner. He had no trouble communicating with Ballou and reasonably believed that petitioner understood everything that was told him. Counsel was also cognizant of the pre-trial report which found that Ballou understood the charges, his defenses, the possible punishments and procedures, and which further concluded that petitioner was competent to stand trial.

Smith obtained access to the victim's statement accusing Ballou of rape, and he interviewed the officer who had questioned the girl. He reviewed the medical evidence which was, at best, inconclusive on the ultimate issue of whether the child had been raped. Smith knew that Ballou had no alibi for the time period of the alleged rape. In fact, Smith was informed by his client that Ballou had been with the victim at the time in question and had attempted to have intercourse with her. Smith also learned that Ballou had told the arresting officers and certain deputies at the jail where he had been housed that he had tried to have intercourse with the girl but had been unsuccessful.

In addition, counsel had been informed that the prosecution refused to negotiate a plea of attempted rape and that petitioner would have to face a jury on a plea of not guilty to rape. He was also aware that a local jury had recently sentenced the rapist of a child to death. Although the death penalty for rape had subsequently been abolished, petitioner was still facing a possible life sentence. Smith had some reason to believe that if his client pleaded guilty and received a favorable psychiatric evaluation that petitioner would be placed on probation. Given the facts known to Smith at the time of the plea, we conclude that counsel's decision not to pursue every avenue of investigation open to him and his representation of Ballou were not so unreasonable as to deny petitioner the "counsel" guaran-

---

**7.** The Commonwealth also maintains that petitioner was not prejudiced by Smith's representation. In light of our holding that Smith's representation was not constitutionally deficient, we need not address the issue of prejudice. *Strickland,* 104 S.Ct. at 2069.

teed him by the sixth amendment. *Id.* at 2066–67, 2064.[8]

### III.

On the basis of the foregoing, the judgment of the magistrate is reversed.

REVERSED.

SPROUSE, Circuit Judge, dissenting:

I respectfully dissent.

The rape or attempted rape of an eleven year old child is a reprehensible act. We cannot know, however, if John Ballou molested or attempted to rape the unfortunate young victim who accused him of the crime. One logical interpretation of the evidence suggests strongly that he did not. The more germane issue in this appeal, however, is whether he was competently represented so that a court or jury could even decide his guilt or innocence. My belief is that under the guidelines established by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), he was not competently represented. The majority in its opinion has fairly summarized the facts, but I must differ with its reasoning that *Strickland* requires a conclusion that there was not ineffective assistance of counsel to Ballou's prejudice.

*Strickland* essentially requires that to prove constitutional ineffective assistance of counsel it must be shown that the representation was deficient to such an extent that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment and that the deficient performance prejudiced the defense. 104 S.Ct. at 2064. This test, of course, is highly fact specific, but, in my opinion, the facts describing Smith's representation of Ballou offer a classic description of ineffective representation. Defense counsel failed to develop Ballou's defense in three major areas: 1)

his client's mental and psychological condition; 2) inconsistency between the victim's statements and the medical evidence; and 3) the victim's own psychological history.

John Ballou is a thirty-seven year old man with a seventh grade education who was diagnosed early in life as bordering on being mentally retarded. Uncontradicted psychiatric testimony established that he was highly susceptible to suggestions such as allegedly made by the victim's parents that he admit to unsuccessfully attempting intercourse with the young victim. Ballou's attorney, Arthur Smith, was familiar with Ballou and his family, and he was aware that Ballou was mentally retarded. Smith had represented Ballou once before in 1973 on charges of sodomy stemming from an incident involving several neighborhood children. In connection with these earlier charges, Ballou had undergone a psychiatric evaluation which resulted in the doctor informing Smith in 1973 that Ballou's mental state created "a real question concerning his competence for trial...." The sodomy charges, which Ballou denied, were never proven, but were taken under advisement by the court on the condition that Ballou continue psychiatric treatment on an out-patient basis. The prosecutor, to be sure, secured a psychiatric evaluation of Ballou which found him competent to stand trial. The fact that the prosecution met this minimal requirement, however, should not have stopped Smith from exploring a possible defense of mental incompetency.

Prior to his sentencing, Ballou received a psychiatric evaluation which concluded in part that he is "an extremely vulnerable individual, highly susceptible to the influences of persons and situations around him. His judgment tends to become impaired when placed in stressful situations, particularly those related to his needs for affection and self esteem." Dr. Robert Showalter, who supervised Ballou's evalua-

---

**8.** Moreover, at his arraignment, Ballou stated that his guilty plea was voluntarily and freely given; that his attorney had advised him of the possible punishment resulting from his guilty plea; and that he had not been promised any leniency as an inducement to plead guilty. At his sentencing hearing, petitioner also stated that he had no complaints concerning counsel's representation of him and that Smith had not failed to do anything which Ballou thought he should have done or which petitioner had asked him to do.

tion, confirmed these findings at the habeas corpus hearing. He stated that Ballou's subnormal intelligence is manifested by a high degree of suggestibility, making Ballou very gullible and easily led. The psychiatric evidence in Smith's possession or available to be developed should have been a starting point in this discrete defense against charges of rape.

Second, the victim's statements conflicted sharply with the medical evidence. She said that Ballou penetrated her three times and she felt fluid go into her body. The pediatrician who examined her after the alleged rape, Dr. Frank Guilfoyle, testified at the habeas corpus hearing that her genitalia had not been penetrated, that there was no spermatozoa on the vaginal slides nor on her underclothing and that no pubic hair was discovered on her person or clothing. The mild genital irritation he found in the child was consistent with the "use of harsh soaps, bubble bath in particular, [or] self-manipulation." Dr. Guilfoyle also testified that the girl had been treated for a similar genital irritation on two previous occasions. After describing suspected causes of the irritation, he went on to opine that, based on his examination and the results of the hospital tests, there had been no penetration and the girl had not been raped.

Smith conceded at the habeas corpus hearing that during his investigation, he became aware of Dr. Guilfoyle's report and the hospital test results. Despite the obvious contradiction between the girl's statement regarding penetration and the medical reports which found no evidence of sexual assault other than slight irritation, Smith never interviewed the girl, nor contacted Dr. Guilfoyle or the doctor who treated the girl at the hospital. In fact, at the evidentiary hearing below, Smith testified that he thought the medical evidence *confirmed* the girl's statement.[1] Had he taken the simple and obvious step of contacting Dr. Guilfoyle, Smith would have had his blunder corrected for him.

At his arraignment, Ballou pled guilty to the rape charge. Because Smith had agreed to stipulate the entire case against his client, the evidence was then recited in narrative form by the prosecutor. The recital of the evidence included the misleading statement that the pediatrician had "confirmed that she had been sexually molested. . . ." The prosecutor did not introduce into evidence the doctor's written report or the negative results of the hospital tests. The prosecutor concluded by introducing into evidence the girl's statement made to police the day after the alleged rape. For his part, Smith failed to introduce any of the medical reports into evidence, and when the trial court advised him that all the witnesses were available for cross-examination, he declined the opportunity.

The child also had a history of the kind of psychiatric disturbance that would have been vital evidence in a trial. In January of 1975—eight months prior to the alleged rape or attempted rape—a psychological evaluation revealed that she had a manipulative personality and was "an habitual liar."

Smith also testified at the hearing that during his investigation he became aware that the girl had once been in an accident which resulted in brain damage and that she "was emotionally disturbed." He also recalled learning of the psychological evaluations concerning the girl.

Smith testified that out of a desire to "curry some favor" with the prosecuting attorney and the girl's family, he waived Ballou's right to a preliminary hearing, thus relinquishing the opportunity to test the girl's story and record her testimony for possible use at trial as impeaching evidence. Smith admitted that he received nothing from the prosecution in exchange for this waiver and, in fact, stated that he

---

1. When confronted with the results of the hospital tests at the evidentiary hearing, Smith admitted that they were "a little bit" in conflict with the girl's statement. Although Smith testified that he had seen the test results during his investigation, he apparently failed to attribute any importance to them.

never even considered negotiating for something in return.

Although he was unable to recall whether or not he discussed the waiver of the preliminary hearing with Ballou, Smith felt sure that he did. The nature of the few conferences at the jail between Smith and Ballou, however, is entirely speculative. Ballou testified that Smith never discussed the elements of rape or possible defenses with him. Rather, according to Ballou, Smith was always in a rage during his visits over the fact that Ballou had told the police he unsuccessfully attempted intercourse with the girl. For his part, Smith was unable to recall whether or not he discussed the elements of the crime or potential defenses with Ballou, but stated, "I expect that I did." Rather, Smith's testimony revealed that his practice in preparing the defense was to hold "strategy determinations" in his office with members of Ballou's immediate family and then report the results of those sessions to Ballou in jail.

During the same period that Ballou was being evaluated for sentencing, the girl Ballou had pled guilty to raping was placed in the hospital by her parents for psychiatric evaluation. The girl's parents reported that she was uncontrollable and that she was falsely accusing her father and brother of raping her. As noted earlier, Smith testified at the habeas hearing that during his investigation he became aware of her emotional problems including the psychological evaluations, but did nothing to develop this aspect of his client's defense. Following the victim's release from the hospital, Dr. James Shield, Jr., her treating psychiatrist, responded to a request from the prosecutor and sent him a letter which stated that much of the girl's problems stemmed from the rape she had experienced. The prosecutor quoted extensively from this letter at Ballou's sentencing hearing. Dr. Shield testified at the habeas corpus hearing below, however, that when he wrote that letter he relied on the representations of others that the girl had been raped. He stated that he would have doubted that she had been raped if the only basis for that conclusion was the young girl's assertion. Dr. Shields also testified that the girl had a long history of emotional disturbance; he had diagnosed her as having chronic brain syndrome, with seizures, together with subnormal intelligence and an excessive neurotic condition manifested by a severe obsession with sex. According to Dr. Shield, the girl's family described her as a pathological liar and his evaluation found that "[s]he did not have much regard for the truth...." The girl was recommended for long-term inpatient treatment.

Smith's testimony that he had forty years trial experience and had represented defendants in over five hundred felony cases, in my view, only emphasizes the degree of incompetence displayed in Ballou's defense. A trial attorney with that experience should have been energized to action with far less evidence and potential evidence than was handed to Smith.

In the absence of a trial, any conclusion as to prejudice in a case must, of course, be speculative to some degree. The range of speculation here, however, is narrow—how could a jury at least not have considered the victim's overt contradictions, her chronic history of lying, particularly in fabricating sexual activity, her unfortunate emotional problems, and, finally, Ballou's own mental retardation and susceptibility to suggestion. A jury certainly could not have ignored the uncontradicted medical evidence weighing heavily against the probability of actual rape. Finally, even a judge predisposed to a heavy sentence for this kind of crime might well have viewed his sentencing responsibility differently had he been alerted by counsel to existing evidentiary inconsistencies.