Kenneth WILLIAMS, Plaintiff-Appellee,

v.

Robert R. KELLY, Warden,
Defendant-Appellant.

No. 86–7281.

United States Court of Appeals,
Fourth Circuit.

Argued March 4, 1987.

Decided April 13, 1987.

Rehearing and Rehearing In Banc
Denied May 12, 1987.

Linwood Theodore Wells, Jr., Asst. Atty. Gen. (Mary Sue Terry, Atty. Gen. of Va., on brief), for defendant-appellant.

Andrea Celestine Long (Boone, Beale, Cosby & Hyder, on brief), for plaintiff-appellee.

Before HALL, Circuit Judge, HAYNSWORTH, Senior Circuit Judge, and TIMBERS, Circuit Judge for the Second Circuit, sitting by designation.

TIMBERS, Circuit Judge:

Appellant Robert R. Kelly, Warden of the Deerfield Correctional Center at Capron, Virginia, ("appellant") appeals from an order entered August 29, 1986 in the Eastern District of Virginia, David G. Lowe, *Magistrate*, which granted a petition by appellee Kenneth Williams ("appellee") for a writ of habeas corpus. The magistrate granted the petition on the ground that appellee had been denied effective assistance of counsel at his state criminal trial.

Appellee was convicted of felony murder in a Virginia state court after a bench trial. The prosecution's evidence at trial consisted largely of testimony by a police officer regarding a confession made by appellee. That evidence established that appellee and another man had taken a radio from the victim and that the other man had stabbed and killed the victim. Appellee's counsel did not move to strike after the prosecution's case. Appellee then was called to the witness stand and testified regarding other details of the crime. His testimony established clearly that violence had been used before appellee and the other man had taken the victim's radio. Under Virginia law, appellee could not have been convicted of felony murder unless he participated in a robbery of the victim. An element of robbery in that State is that violence or

intimidation precede or coincide with the taking of property.

In his habeas petition, appellee claimed, first, that he had been denied effective assistance of counsel at his trial, and, second, that the indictment was constitutionally defective. The magistrate, in granting appellee's petition, held that his counsel's failure to move to strike after the prosecution's case, coupled with counsel's advice to appellee to testify, rendered counsel's performance constitutionally deficient. According to the magistrate, appellee could not have been convicted on the prosecution's case alone since it did not establish that violence had preceded or coincided with the taking of the radio.

On appeal, appellant claims that the magistrate erred in granting the petition since appellee failed to make the requisite showings under *Strickland v. Washington*, 466 U.S. 668 (1984), that counsel's performance was deficient and that the deficiency prejudiced the defense.

We hold that appellee's ineffective assistance claim fails since he has not shown that his counsel's performance was deficient: counsel's failure to move to strike and his advice to appellee to testify were part of a reasonable trial strategy. We therefore reverse the order of the magistrate granting the petition. Since the magistrate did not address appellee's claim based on alleged defects in the indictment, we remand the case for consideration by the magistrate of that claim.

We reverse and remand.

## I.

We summarize only those facts believed necessary to an understanding of the issues raised on appeal.[1] In view of the importance of the facts in this habeas case, we set them forth in detail.

At approximately 8:00 p.m. on October 3, 1980, Kirkwood Mathews arrived at the house of a friend—Lorraine Jessup—at 3004 "S" Street in Richmond, Virginia.

Mathews left the house at 8:45 p.m. to purchase a bottle of vodka. He had with him a portable combination radio and cassette tape player. Later that evening, Detective Donald C. Gery of the Richmond Police Department, responding to a call, discovered Mathews lying on the front porch of a residence situated at 2508 "Q" Street. Mathews had a stab wound on the right side of his neck, near the collar bone. Evidence nearby indicated that Mathews had been stabbed on North 25th Street in front of a liquor store and had stumbled to the residence on "Q" Street in an unsuccessful quest for assistance. At Gery's direction, Mathews was rushed by ambulance to a hospital. After remaining unconscious for several hours, Mathews died early in the morning of October 4. The autopsy report stated that Mathews had bled to death.

Through a subsequent investigation, Detective Gery learned that the portable combination radio and cassette tape player had been taken from Mathews some time after he left Jessup's house. On October 10, Gery observed a 14 year old boy carrying such a radio on Mosby Street. Gery then met with the boy's father, John T. Brown. Gery learned that the elder Brown, who had a previous acquaintanceship with appellee, had purchased the radio from appellee and another man for $45 sometime after 9:00 p.m. on October 3.

On November 16, a magistrate in the Richmond General District Court (a state court) issued a warrant for the arrest of appellee on the complaint of Detective Gery. Gery arrested appellee the following day. After Gery advised him of his rights, appellee confessed to his participation with another man, Ronald Rivers, in the events leading to the death of Mathews.

Some time after appellee's arrest and confession, James Hatcher Johnson, Esq., was appointed to represent appellee in connection with criminal charges to be filed against him in Division One of the Rich-

1. Our statement of facts, unless otherwise indicated, are based upon the transcript of appel-
lee's state court trial.

mond Circuit Court.[2] Although the state court record is not entirely clear, it appears that both appellee and Rivers were charged with capital murder of Mathews, Va.Code Ann. § 18.2–31 (1982), and the robbery of Mathews' radio. At a preliminary hearing on the charges, appellee, with Johnson present, testified to the involvement of himself and Rivers in the events resulting in Mathews' death. A transcript of the hearing is not in the record before us. After the preliminary hearing, the state prosecutor agreed to seek an indictment against appellee only for first degree murder and robbery, but not for capital murder, if appellee would testify against Rivers at trial. Appellee did testify. Rivers was convicted after a jury trial before Richmond Circuit Judge James M. Lumpkin. Judge Lumpkin sentenced Rivers to 28 years imprisonment.

After Rivers' conviction, the state prosecutor informed Johnson that, because of appellee's cooperation, he intended to try appellee only for first degree murder or robbery, but not both, if appellee either would plead guilty or agree to waive his right to a jury trial.

On January 5, 1981, appellee was indicted for robbery and first degree murder. A Virginia statute defines first degree murder as including, among other types of murder, murder committed during the commission of certain types of felonies; or, what was known at common law as "felony murder". Va.Code Ann. § 18.2–32 (1982) ("Murder, in the commission of . . . robbery . . . is murder of the first degree."). Both first degree murder, Va.Code Ann. § 18.2–10(b) (1982), and robbery, id. § 18.2–58 (1982), carry maximum penalties of life imprisonment.

The murder charge against appellee was tried before Judge Lumpkin on February 13, 1981. At the beginning of the proceedings, appellee pleaded not guilty and waived his right to a jury trial. After ensuring that appellee understood the elements of the charge against him and that his waiver of the right to a jury trial was made knowingly, Judge Lumpkin accepted the plea and the waiver.

The prosecution called three witnesses. Jessup testified that Mathews had left her house on the evening of October 3 to purchase vodka and that he had the radio with him on his departure. Brown testified about the sale of the radio to him by appellee and Rivers. The prosecution's last witness was Detective Gery. After Gery testified on direct examination concerning the details of his investigation of Mathews' death, he testified regarding appellee's confession referred to above:

"Q . . . [D]id there come a time then that you advised him of certain constitutional rights?

A Yes, it was.

Q All right, would you relate to the Court what, if any, rights you advised him of?

. . . .

Q All right, let me stop you at this point? . . . . Was this a tape recording or is this your recollection?

A This is a tape recording that was taken and subsequently transcribed.

. . . .

Q . . . [W]ould you relate to the Court what, if any, statement he made to you?

A You don't want me to—you just want me to summarize the—it's rather lengthy—

Q Summarize it if you would?

A He indicated that on the night of the offense that he and a subject, Ronald Rivers, were together and that they had seen the victim walking in the eleven hundred block of North 25th Street.

They had also seen that he was carrying a tape player, it was their intention to take the tape player from the victim, which they did.

He stated that he had gotten the tape player and cross the street and realized that a struggle was taking place between Mr. Rivers and the victim.

. . . .

Q All right, what else?

**2.** The facts in this and the following paragraph are based upon the transcript of the evidentiary hearing on appellee's state habeas corpus petition. We discuss this later in this opinion.

A And he stated that they were fighting and that he was pulling a knife on him.

He stated that after this altercation on 25th Street they went to his home and then sometime shortly after that went to Tulip and Venable where they sold the tape player to Mr. Brown.

He later realized, I think it was the following morning that the young man had been killed and that's basically the gist of the statement.

. . . .

Q All right, and can you describe again for the Court, because I didn't follow it, what was the method of attack that they were going to use on the man that they had agreed—

A They were just going to take the tape player from the young individual and I assume run,

Q All right, thank you?

A a snatch type thing."

As is apparent from Gery's testimony, a tape recording, and a transcript of that recording, had been made of appellee's confession. Neither the tape nor the transcript, however, were introduced in evidence at the trial, and neither is in the state court record before us.

After Johnson cross examined Gery, the prosecution rested. Johnson made no motions on behalf of appellee. He proceeded to put on the defense case. Appellee was the only witness for the defense. Appellee testified on direct examination by Johnson in relevant part as follows:

"Q All right, would you tell His Honor in your own words, what happened from the time that you and Ronald Rivers first saw the deceased until after the transaction, would you tell His Honor directly?

A Well, Ronald and I was coming down 25th Street and the guy was coming toward the whiskey store.

We noticed the tape player so we decided that we would snatch the tape player when he came out the liquor store and run and Ronald was supposed to hit the man and I was supposed to grab the tape player and run.

Okay, so when he came out the whiskey store Ronald approached the man, I grabbed the tape player and I ran across the street.

I looked around for Ronald and when I looked back they was on the ground scuffling. I waited for Ronald to come across the street and when he came across the street he had a knife in his hand. So I say, 'What happened, man,' and he say, 'The guy grabbed me, I had to stab him,' just like that.

From there we went on around to a guy house I know and we tried to sell the tape player and during the struggle Ron had cut his hand. I asked the man for a sheet, so he gave me a sheet and I tore it and gave Ronald a piece and he took it—

Q Were you aware that Ronald Rivers had a knife in his possession at this time?

A No, I didn't.

Q Was part of the plan to use a knife or any other kind of weapon?

A No.

. . . .

Q What were you supposed to do during the course of this incident?

A Well, I was suppose to grab the tape player and run after he hit him.

Q All right, and you did that?

A Yea.

Q When was the first time you realized that the victim had been injured?

A Well, I knew he was injured after—when Ronald got across the street he told me what he did so I knew he was injured then.

Q All right, did you know how bad he was hurt?

A No.

. . . .

Q All right, was it ever part of your plan to stab him?

A No, it wasn't."

On cross examination, appellee elaborated on his participation in the events resulting in Mathews' death:

"Q All right, now, if I'm not mistaken, the plan was for Ronald to hit the

man and then when he was stunned for you to grab the tape player and run,

A Right.

. . . .

Q Well, now, you knew that Ronald was going to hit him, didn't you?

A Right.

. . . . See when—okay, when the guy approached us Ronald asked to look at it, right, so when he stuck it out that's when I grabbed it and that's when they start struggling.

Q So Ronald did have to hit the man?

A Yea.

. . . .

Q How much violence did you think was going to have to be used to take the tape player away from the man?

A Well, just to hit him and I snatch it and run and that was it."

After appellee testified, Johnson rested the defense case, and both sides made arguments. Johnson argued in part—

"Our argument in this. This defendant had no intention of killing or seriously injuring anyone. He had no plan which involved this activity and had no knowledge that such even took place."

Judge Lumpkin found appellee guilty of murder in the first degree.

Some time after appellee's conviction, the robbery charge against appellee was dismissed on consent of the prosecutor.

Judge Lumpkin held a sentencing hearing on April 10, 1981. Johnson again stressed the low level of appellee's participation in the events leading to Mathews' death:

"[T]his man didn't kill anybody. The evidence before the Court is uncontroverted that he intended for no one to die or even to be injured; he intended to take a tape player away from a young man walking down the street.

The—his participation in this was not the cause of the death and his participation was not an act calculated to cause death or serious bodily injury but that was the end result and that's what we're stuck with. Therefore, he receives his conviction based upon a fiction of law.

Prior to his conviction and during the trial of the codefendant he—and during his own trial he fully admitted his participation in this matter. . . .

I'm not trying to say this in praise of the man, Your Honor, I would ask that in view of the totality of the situation that—I know the powers of this Court are awesome in a crime like this as far as the sentencing provisions are concerned.

I would ask that the Court not stick him and play the metaphor case so that he would never expect to see the light of day again but to give him some hope that—a chance to straighten himself out."

At the conclusion of the hearing, Judge Lumpkin sentenced appellee to 20 years imprisonment, with five years suspended. A judgment of conviction was entered the same day. In an order dated September 28, 1981, the Supreme Court of Virginia summarily denied appellee's petition for appeal from the judgment of conviction.

Appellee filed a pro se petition for a writ of habeas corpus in the Richmond Circuit Court on April 7, 1983. Appellee claimed, first, that he had been denied effective assistance of counsel at his trial in violation of the 6th and 14th amendments to the United States Constitution; and, second, that, for a variety of reasons, his indictment was constitutionally defective.

Richmond Circuit Judge James B. Wilkinson held an evidentiary hearing on the state habeas petition on June 1, 1983. Another attorney, Robert P. Geary, Esq., (not to be confused with Detective Donald C. Gery, referred to above) was appointed to represent appellee. At the hearing it became apparent that appellee's ineffective assistance claim was based on Johnson's advice to appellee to testify at the trial. Geary argued that appellee could not have been convicted of felony murder absent proof of his participation in the robbery, and that appellee's testimony provided the only evidence of the use of force contemporaneous with the taking of the radio. Use of such force is an element of robbery under Virginia law.

Johnson was one of the witnesses at the hearing. On cross examination by Geary, Johnson explained his trial strategy at appellee's trial:

"Q Mr. Johnson, you understood in order for the Commonwealth to convict Mr. Williams of murder, they had to prove he was a participant in the robbery of the victim; is that right?

A Yes.

Q And, knowing that, you recommended to Mr. Williams that he testify at his own trial?

A Yes.

Q During that time you knew he would have to admit participation in the robbery?

A Yes, sir.... Mr. Williams had already testified before the same judge what his entire participation was.... I thought he was going to be convicted if he didn't testify.

Q What made you think that way?

A Because of his confession to the police.

Q What do you recall Detective Gery testifying about that?

A I recall Detective Gery's testimony, the best I could recall, the co-defendant, Mr. Rivers, and the defendant, had made an agreement to assault the victim.... Mr. Rivers would do the hitting of the victim, and Mr. Williams would take the radio and run with it. This is what he told the detective after they were arrested, when he agreed to cooperate with them, that the codefendant would strike him. What really happened is that the victim put up a greater fight than the co-defendant expected, and this gentleman ran across the street away from the action, at which time the cutting took place. That was the point of Mr. Williams' trial of having him testify. It was my opinion he was going to be convicted and at that point that is what he needed to do. I think he needed to come forward basically and confess. Not so much confess, but at least tell what happened in his part of the trial, because in the presentence report, he admitted this

thing candidly, at least what his involvement was....

Q You were, in a sense, pleading guilty by putting him on the stand?

A I think he had already made his confession to the police and that evidence was already in, what he had done. I thought the Judge would be more impressed by his coming on the stand, and he wanted to tell how he didn't do any cutting, how he wasn't there when the actual cutting occurred, and the only way for him to get it into evidence was for him to get on the stand and testify."

Judge Wilkinson denied the state habeas petition from the bench at the conclusion of the hearing. He held that Johnson's advice to appellee to testify was part of an ultimately successful strategy to obtain a relatively short prison sentence. He also held that a rational trier of fact properly could have convicted appellee based on Gery's testimony regarding appellee's confession.

On December 9, 1983, the Supreme Court of Virginia summarily denied appellee's petition for appeal, being "of [the] opinion [that] there is no reversible error in the judgment complained of."

Appellee filed the instant federal habeas petition on December 13, 1985, again raising as grounds for collateral relief his ineffective assistance of counsel and defective indictment claims. Both parties filed consents to the jurisdiction of the magistrate. The magistrate held a hearing on the petition on August 25, 1986.

In an opinion dated August 29, 1986, the magistrate granted appellee's petition for a writ of habeas corpus. The magistrate did not address appellee's defective indictment claim. He granted the petition on the ground that appellee had been denied effective assistance of counsel under the standards set forth in *Strickland, supra*, 466 U.S. 668.

The magistrate recognized that under Virginia law appellee properly could not have been convicted of felony murder absent proof that he was a participant in the robbery of Mathews. To prove robbery under Virginia law, the magistrate stated, a taking of property must be preceded by

or be contemporaneous with violence or intimidation. Based on these principles, the magistrate held that Johnson's performance had been deficient in two respects. First, Gery's testimony concerning appellee's confession was insufficient to establish the element of violence or intimidation and therefore "the Commonwealth's case could not have survived a motion to strike at the conclusion of the Commonwealth's evidence." Johnson's failure to make such a motion, the magistrate held, constituted ineffective assistance of counsel. Second, according to the magistrate, Johnson had committed a grave error in "elect[ing] to have [appellee] testify", since "[i]t was [appellee's] testimony which supplied the missing element of violence during the taking of the tape player". The magistrate stated:

> "It strains logic ... to conclude that an attorney does his client any service by putting his client on the witness stand to admit all of the elements of the offense with which he is charged, after the Commonwealth has failed to prove its case. What occurred in the instant case was not simply a tactical error, it was a complete failure of counsel to understand, recognize or apply the most fundamental aspects of the law. Moreover, had it not been for counsel's incompetence, petitioner could not have been convicted of the crime for which he is now imprisoned."

On August 29, 1986, an order granting appellee's petition was entered on the magistrate's opinion. Execution of the order was stayed "until such time as, in the event of an appeal herein, the United States Court of Appeals for the Fourth Circuit renders an opinion therein and its mandate issues."

On September 22, 1986, appellant filed a notice of appeal from the magistrate's order of August 29, 1986. Also on September 22, 1986, appellant moved the magistrate pursuant to Fed.R.App.P. 8(a) and 23 to stay enforcement of the order of August 29 pending appeal. The magistrate granted appellant's motion in an order entered October 2, 1986.

On November 12, 1986, appellee moved the magistrate pursuant to Fed.R.App.P. 23(c) to order appellant to release him from custody pending appeal. In an order entered November 25, 1986—over a month after appellant filed its notice of appeal— the magistrate granted appellee's motion and ordered appellant to release him. Pursuant to the magistrate's order, appellee was released on a $5,000 surety bond on November 25.

For the reasons set forth below, we reverse the magistrate's order of August 29, 1986 which granted appellee's petition for a writ of habeas corpus.

II.

■ The framework for a proper analysis of appellee's ineffective assistance of counsel claim is set forth in *Strickland, supra,* 466 U.S. 668. To prevail on that claim, appellee must show, first, that Johnson's performance was deficient, and, second, that his deficient performance prejudiced the defense. *Id.* at 687. "Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*

At the outset, we wish to make it clear that we are not bound under 28 U.S.C. § 2254(d) (1982) by Judge Wilkinson's ultimate conclusion that Johnson's performance was not constitutionally deficient. *Strickland, supra,* 466 U.S. at 698; *Hoots v. Allsbrook,* 785 F.2d 1214, 1219 & n. 9 (4th Cir.1986). This is because ineffectiveness of counsel "is not a question of 'basic, primary, or historical fac[t]' " but rather is a "mixed question of law and fact." *Strickland, supra,* 466 U.S. at 698 (quoting *Townsend v. Sain,* 372 U.S. 293, 309 n. 6 (1963)).

Although not bound by Judge Wilkinson's ultimate conclusion, we find ourselves in agreement with it. We hold for reasons set forth below that appellee has failed to show that Johnson's performance was deficient. Since appellee has failed to satisfy this first aspect of the *Strickland* test, we find it neither necessary nor appropriate to decide if appellee has satisfied the second

prong of that test, namely, whether, assuming the deficiency of Johnson's performance, that deficiency *prejudiced* the defense. *Strickland, supra,* 466 U.S. at 697 ("there is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Ballou v. Booker,* 777 F.2d 910, 914 n. 7 (4th Cir.1985).

The "performance" part of the *Strickland* rule requires a showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland, supra,* 466 U.S. at 687. Our inquiry focuses on whether "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The scope of that inquiry is quite narrow:

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction ..., and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"

*Strickland, supra,* 466 U.S. at 689 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101 (1955)).

In the instant case, Johnson's omission in not moving to strike at the conclusion of the Commonwealth's case, coupled with his advice to appellee to testify, led the magistrate to conclude that Johnson "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland, supra,* 466 U.S. at 687. We hold that the magistrate erred. His conclusion rests on an inadequate analysis of Virginia law on robbery and on a myopic view of the evidence introduced by the prosecution against appellee at his trial. When examined in light of a proper analysis of the law and a realistic appraisal of the evidence, Johnson's challenged actions emerge as sound trial strategy that fell well "within the wide range of reasonable professional assistance". *Strickland, supra,* 466 U.S. at 689. Johnson's representation of appellee in our view was not constitutionally deficient.

The Virginia statute under which appellee was charged with first degree murder codifies the common law felony murder doctrine that any participant in a robbery resulting in the death of another may be found guilty of murder even if that participant did not commit the actual killing. Va. Code Ann. § 18.2–32 (1982); *see Wooden v. Commonwealth,* 222 Va. 758, 761, 284 S.E.2d 811, 813 (1981). An essential element of proof in appellee's first degree murder trial, therefore, was that appellee was a participant in the *robbery* of Mathews.

In Virginia, robbery is a common law offense. *Bunch v. Commonwealth,* 225 Va. 423, 439, 304 S.E.2d 271, 280 (1983). A Virginia statute fixes the penalty for robbery at five years to life imprisonment, but does not define its elements. Va.Code Ann. § 18.2–58; *see Pritchard v. Commonwealth,* 225 Va. 559, 561, 303 S.E.2d 911, 912 (1983). Under Virginia common law, robbery is "'the taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation.'" *Jones v. Commonwealth,* 218 Va. 18, 21, 235 S.E.2d 313, 315 (1977) (quoting *Mason v. Commonwealth,* 200 Va. 253, 254, 105 S.E.2d 149, 150 (1958)). "The violence or intimidation that is an essential ingredient of robbery must precede or be concomitant with the taking". *Stamper v. Commonwealth,* 220 Va. 260, 274, 257 S.E.2d 808,

818 (1979), *cert. denied,* 445 U.S. 972 (1980).

In the instant case, the requirement that "[t]he violence [or intimidation] must occur before or at the time of the taking", *Branch v. Commonwealth,* 225 Va. 91, 94, 300 S.E.2d 758, 759 (1983), led the magistrate to reach an unequivocal conclusion regarding application of Virginia law to the evidence at appellee's trial:

"[I]t is clear that the Commonwealth's case could not have survived a motion to strike at the conclusion of the Commonwealth's evidence. The Commonwealth had failed to establish that petitioner was a participant in anything other than larceny from the person. There is a singular lack of evidence concerning the manner in which the tape player was taken from the victim, or in relation to what was a subsequent struggle between the victim and a co-defendant.... Had the defendant rested his case [after Detective Gery's testimony], the only evidence before the court would have been that the defendant took a tape player belonging to the victim and that thereafter his co-defendant struggled with and killed the victim. Such evidence could not have been sufficient to prove robbery under Virginia law."

A more comprehensive examination of Virginia cases leads us to conclude that the law of robbery as it applies to the instant case is not as crystal clear as the magistrate indicated.

■ Under Virginia law, the absence of direct evidence of the timing of the intimidation or violence in relation to the taking of property is not necessarily fatal to a finding that the defendant committed a robbery. In lieu of direct evidence, Virginia law is satisfied by "[i]nferences ... drawn from proven facts so long as they are reasonable and justified." *Durham v. Commonwealth,* 214 Va. 166, 169, 198 S.E.2d 603, 606 (1973). In *Stamper, supra,* 220 Va. 260, 257 S.E.2d 808, for example, the murder victims were found in a room with an empty safe that several hours earlier had contained several thousand dollars. On appeal from capital murder convictions—an element of which was that the defendant had robbed the victims—the defendant claimed that the evidence was insufficient to show that violence had preceded or had been concomitant with the taking of the money. The Virginia Supreme Court affirmed the convictions, holding that "[t]he evidence that the murders occurred during the commission of a robbery is overwhelming." 220 Va. 274, 257 S.E.2d at 818. The court stated:

"It is a reasonable inference that [one of the victims] either opened the safe under duress and intimidation or was duped into opening it, and was then beaten, cut, and shot as he attempted to prevent the consummation of the robbery. It is also a reasonable inference that [the other victims] were shot as the robber sought to escape with the loot and to avoid subsequent identification by eyewitnesses."

*Id.,* 257 S.E.2d at 818. *Cf. Pettus v. Peyton,* 207 Va. 906, 908, 153 S.E.2d 278, 280 (1967) (although manner in which defendant got possession of gun from prison guard was "not clearly shown", indictment was sufficient to charge common-law robbery, and hence counsel was not ineffective in failing to seek dismissal of indictment).

In the instant case, Detective Gery's testimony regarding appellee's confession provided facts from which a reasonable and justifiable inference could have been drawn that the taking of the radio was preceded by or concomitant with violence or intimidation. Gery testified that appellee "stated that he had *gotten* the tape player and cross [sic] the street and realized that a *struggle* was taking place between Mr. Rivers and the victim." (emphasis added). It would have been reasonable to infer that appellee had "gotten" the tape player through some act of force or intimidation or that the "struggle" taking place had begun at the time appellee had "gotten" the tape player.

Moreover, Gery's testimony that appellee confessed that the taking of the radio was "a snatch type thing" might have given rise to a reasonable inference that appellee had "gotten" the tape player through vio-

lence. Whether a "snatching" can constitute violence appears to be an issue unresolved in Virginia. *Jones v. Commonwealth,* 172 Va. 615, 1 S.E.2d 300 (1939) (reversing robbery conviction based on snatching on ground of lack of intent permanently to deprive victim of property; whether snatching constituted violence not addressed); *see Branch, supra,* 225 Va. at 95, 300 S.E.2d at 760 (discussing *Jones*); *see also State v. Carr,* 43 Iowa 418 (1876) (purse snatching is robbery); *Jones v. Commonwealth,* 112 Ky. 689, 66 S.W. 633 (1902) (same).

Finally, the prosecution was not bound by the account of the criminal incident given in appellee's confession, which was related at trial through Gery's testimony. "Confessions are to be weighed like all other evidence and a jury may believe them in whole or in part, as reason may decide. If from the confession itself, or other evidence, it appears to a rational mind that a part is not true, a jury does not have to accept it." *Durham, supra,* 214 Va. at 169, 198 S.E.2d at 606 (1973) (citing *Upshur v. Commonwealth,* 170 Va. 649, 655, 197 S.E. 435, 437 (1938)). In the instant case, this principle would have enabled a rational trier of fact to disbelieve those portions of appellee's confession—as related in Gery's testimony—which disclaimed involvement in a struggle leading to Mathews' death. An inference of the use of violence or intimidation could have been drawn from those parts of appellee's confession admitting involvement in the taking of the radio and in the planning of the incident.

Whether Judge Lumpkin or a state appellate court would have found that these inferences were justifiable and reasonable might be said to be a matter of speculation. The success or failure of appellee's ineffective assistance claim, however, does not turn on whether *in fact* the prosecutor's case could have survived a motion to strike. Appellee's claim fails if Johnson's failure to make such a motion and his advice to appellee to testify appear—without the benefit of hindsight—to have been reasonable under all of the circumstances as Johnson saw them at the time of trial. *Strickland, supra,* 466 U.S. at 688–89.

We hold that, under all of the circumstances as they appeared to Johnson at the time of trial, the challenged actions were reasonable since they may " 'be considered sound trial strategy.' " *Strickland, supra,* 466 U.S. at 689 (quoting *Michel, supra,* 350 U.S. at 101). As is apparent from the various portions of the transcript quoted above in part I of this opinion, Johnson consistently resorted to a single strategy throughout his representation of appellee. From the inception of his representation, Johnson knew that appellee had confessed to participation in the events leading to Mathews' death. In light of that full confession, Johnson reasonably believed that appellee could have been convicted of both felony murder and robbery. Such convictions could have resulted in two life sentences for appellee. The likelihood therefore was great that appellee would spend a lengthy period in prison. Faced with that likelihood, Johnson resorted to a strategy which perhaps he expressed best during argument to Judge Lumpkin at the sentencing hearing:

"I would ask that the Court not stick him and play the metaphor case so that he would never expect to see the light of day again but to give him some hope that—a chance to straighten himself out."

As a result of Johnson's efforts, by the time of trial appellee faced a single term of life imprisonment. Consistent with his strategy, Johnson viewed the trial as a mechanism to convince Judge Lumpkin that appellee had no intention of harming Mathews, that he was surprised by Rivers' actions, and that he could be rehabilitated. Considering the sentence imposed by Judge Lumpkin, the strategy appears to have been successful.

Johnson's failure to move to strike and his advice to appellee to testify must be viewed as part of his strategy. Clearly,

appellee's testimony was an integral part of Johnson's effort to convince Judge Lumpkin of appellee's limited participation in the events leading to Mathews' death. We decline to second guess Johnson's strategic decision.[3] *United States v. Alexander*, 789 F.2d 1046, 1051 (4th Cir.1986); *Hoots, supra,* 785 F.2d at 1219. Contrary to the magistrate's conclusion, it is not at all clear that "[i]t was [appellee's] testimony which supplied the missing element of violence during the taking of the tape player". In light of the inferences to be drawn from Gery's testimony referred to above, Johnson reasonably could have believed that, under Virginia law, Gery's testimony was sufficient to support a finding that appellee had robbed Mathews.

The failure to move to strike, whether it was a deliberate decision or an oversight, cannot be said to have been unreasonable in light of the circumstances facing Johnson. *Inge v. Procunier,* 758 F.2d 1010, 1016 (4th Cir.), *cert. denied,* 106 S.Ct. 104 (1985). If Johnson made a deliberate decision, it could have been based on a belief that such a motion would have been futile. That belief would have been reasonable in light of the inferences to be drawn from Gery's testimony. If Johnson simply did not consider making the motion, we cannot say that such a failure was so deficient, if indeed it was deficient at all, as to warrant a conclusion "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland, supra,* 466 U.S. at 687. Counsel is not ineffective merely because he overlooks one strategy while vigilantly pursuing another. *Strickland, supra,* 466 U.S. at 689 ("Even the best criminal defense attorneys would not defend a particular client in the same way.").

We hold that appellee's ineffective assistance of counsel claim fails since he has not shown that Johnson's performance was constitutionally deficient.

## III.

To summarize:

To prevail on an ineffective assistance of counsel claim, a convicted defendant must show, first, that his counsel's performance was deficient, and, second, that the deficient performance prejudiced the defense. In granting appellee's petition for a writ of habeas corpus, the magistrate concluded that Johnson's failure to move to strike after the prosecution's case was concluded and his advice to appellee to testify constituted errors of constitutional dimension and therefore that Johnson's performance was deficient. That conclusion, in our view, rested on inadequate analyses of both the Virginia law of robbery and the evidence presented by the prosecution at appellee's trial. When viewed in the light of proper analyses of Virginia law and the prosecution's evidence, we think it is clear that Johnson's challenged actions should be viewed as reasonable tactical decisions. Appellee therefore has failed to show that Johnson's performance was deficient.

Accordingly, we hold that appellee's ineffective assistance of counsel claim fails. We reverse the order of the magistrate granting appellee's petition for a writ of habeas corpus. We remand the case to the magistrate for consideration of appellee's other claim for collateral relief—that his indictment was constitutionally defective.

The mandate shall issue forthwith.

**REVERSED AND REMANDED.**

---

**3.** In light of our holding that Johnson's advice to appellee to testify does not constitute ineffective assistance of counsel, we find it neither necessary nor appropriate to decide whether such a decision *ever* may constitute ineffective assistance, and, if so, under what circumstances.