# Richmond.

## WAYMAN BROOKMAN v. COMMONWEALTH.

November 15, 1928.

Absent, Chichester, J.

The opinion states the case.

*W. Gilmer Dunn*, for the plaintiff in error.

*John R. Saunders, Attorney-General, Leon M. Bazile* and *Edwin H. Gibson, Assistant Attorneys-General*, for the Commonwealth.

CAMPBELL, J., delivered the opinion of the court.

The plaintiff in error was indicted for robbery by violence. Tried by a jury, upon his plea of not guilty, he was found guilty as charged and his punishment fixed at death.

There are six errors assigned:

First: In permitting the attorney for the Commonwealth to amend the indictment on day of trial, over the objection of counsel for petitioner:

Second: Overruling demurrer to the amended indictment;

Third: Overruling exception to the clerk's charge to the jury;

Fourth: Giving of improper instructions to the jury;

Fifth: Overruling motion to set aside the verdict as contrary to the law and the evidence and without evidence to support it; and

Sixth: Overruling motion in arrest of judgment.

So far as applicable, the indictment, as amended, reads thus:

"That said Wayman Brookman, within twelve months prior to the finding of this indictment, to-wit, on the thirty-first day of October, 1927, and in the county aforesaid, in and upon one Stella Mustard, feloniously did make an assault, and that the said Wayman Brookman, with a certain shot gun then and there charged with gun powder and leaden balls, with which shotgun, he, the said Wayman Brookman, in his hand then and there held, then and there feloniously did discharge off, at, against and upon the said Stella Mustard, and the said Wayman Brookman, with the leaden balls aforesaid, out of the shotgun aforesaid, discharged and shot off as aforesaid, then and there feloniously and violently did strike, penetrate and wound the said Stella Mustard, in and upon the side of the head, and he, the said Wayman Brookman, *in the manner and by the means aforesaid*, did then and there, her the said Stella Mustard, in great bodily fear and by violence, feloniously did put, *in the manner and by the means aforesaid*, and nine dollars ($9.00) in legal currency of the United States of America, of the value of nine dollars ($9.00) of the goods and chattels, legal currency and property of the said Stella Mustard, from the person, in the presence, custody and control of the

said Stella Mustard, and by force, violence and against the will of the said Stella Mustard, then and there, to-wit, *on the day and year aforesaid,* feloniously and violently did steal, take and carry away * * *." The language in italics indicates the amendments allowed.

If it was error to permit the attorney for the Commonwealth to amend the indictment, then the second, third and fourth assignments of error are also well founded, as the indictment, clerk's charge and instructions given are all dependent upon the legal proposition of whether or not the accused has been properly charged with and convicted of an offense carrying with it the death penalty.

■ ■ Robbery is a common law crime in this State and while our statute, section 4405 of the Code, regulates the punishment, it does not attempt to define robbery, but leaves the crime as it was defined at common law. Robbery at common law is thus defined in Mr. Minor's Synopsis of the Law of Crime and Punishments, page 80: "The definition of robbery, in its common law sense, is the felonious and forcible taking of money, or goods of value, from the person of another, or in his presence, against the owner's will, by violence or putting him in fear." See also 2 East P. C. 707; Wharton's Criminal Law (8th ed.), Vol. 1, page 657; 2 Bishop Cr. Law (1st ed.), page 414; 34 Cyc. page 1796; 25 R. C. L., page 1139.

■ ■ The indictment, it is contended by the accused, contained but one count, and this count contained two entirely separate and distinct offenses, and therefore the indictment is demurrable. To constitute a good and sufficient indictment for robbery, the indictment must allege a felonious taking of personal property of another, against his will, from his person, or what is

equivalent thereto, in his presence, by force or putting him in fear. *Houston's Case*, 87 Va. 257, 12 S. E. 385. While the indictment is not skillfully drawn, it does charge, prior to the amendments, all the elements of robbery at common law. It sets forth that the accused made a felonious assault upon Stella Mustard with a shot gun loaded with gun powder and leaden bullets, which he fired at her, striking and wounding her; that, as a result of the assault, he put her in bodily fear; and that from the custody and control of Stella Mustard, by force, violence, and against her will, feloniously did steal, take and carry away the sum of nine dollars, legal currency, the property of the prosecutrix.

The amendments permitted by the court did not change the "character of the offense charged," nor do we think they were essential to the validity of the indictment. The indictment contained all the essential common law elements and fully apprised the accused of the fact that he was being tried under the first clause of section 4405 of the Code. The amendments amounted to a nullity, hence it was not error to overrule the demurrer.

The fifth assignment of error calls in question the action of the trial court in overruling the motion to set aside the verdict asc ontrary to the law and the evidence.

The evidence adduced by the Commonwealth shows the following: The accused, who was twenty years of age, on the morning of October 31, 1927, armed with a shotgun, went to a store in which is located the post office at Cismont, in Albemarle county, Virginia. This store was owned by Mrs. Stella Mustard. The accused stopped on the porch a few minutes before going in, and then went into the store carrying his gun. He first asked for a tin of tobacco and a package of cigarettes which Mrs. Mustard handed him and which he

put in his pocket. He then asked for some shotgun shells. The witness could not remember which number he asked for. The accused then purchased a pair of socks and a pair of shoes. Mrs. Mustard figured up the amount of his purchases and told him how much he owed her, starting at the time to wrap up the shoes. The accused hesitated and seemed undecided, and then asked what was the price of a knife which was in the show case, and directed Mrs. Mustard to wrap it up with the shoes. While she was wrapping the package, he walked toward the counter as if looking at something. At that instant, Mrs. Mustard testified, she seemed to realize that she had been struck on the head by what she thought was the scale weights. She was unable to say whether she fell or sank to the floor. She put her hand to her head and felt a substance which she thought was her brains, but afterwards found it was oatmeal and blood. It was two or three minutes before she heard the accused make any move. When she did hear him move, she pretended she was dead, thinking he would kill her if he found her alive. She then heard the bell in the cash drawer ring and had the impression of seeing the form of some one behind the counter.

As a result of the wound inflicted on her, Mrs. Mustard lost the sight of one eye, the hearing in one ear was impaired, her sense of smell was destroyed, and she was left in a very nervous condition.

It appears that there were a five dollar bill, some one dollar bills and small change in the money drawer of the store. When the accused was arrested, the officers found on him a five dollar bill and four one dollar bills. The accused admitted that the money the officers found was the same money which he took from the store.

A part of the load from the shotgun which struck Mrs. Mustard passed through several boxes of oatmeal on the counter, some of the oatmeal having lodged in Mrs. Mustard's ear. An empty shotgun shell was found on the floor of Mrs. Mustard's store by some of the men with the sheriff.

The accused was arrested at his home in Orange county that night. At the time of his arrest a single barrel shotgun and nine number five shells were found in his house. The accused bought only ten shells at the store. The cash drawer in which the money was kept was found in a field by the deputy sheriff. This drawer "had been torn out or loose from under the counter." This witness further testified that the empty shell found in the store was similar to the loaded shells found in the possession of the accused at his home.

On the morning after the arrest the accused asked for the sheriff, but when the sheriff did not come, he sent for two policemen named Yowell and Wood. In the presence of J. H. Jones, the jailer, the accused told Yowell and Wood that his brother had committed the crime; that his brother had a grudge against him on account of some girl and had borrowed his overalls, trying to make it appear that the crime had been committed by the accused. One of the officers said to him that his brother had not been seen for a week. The accused then stated that he did the shooting, but that it was accidental, and denied that he had taken any money. The only money found on the accused was the nine dollars referred to in the testimony of J. Mason Smith, which was admitted by the accused to to be the same money taken by him from the store.

The accused testified in his own behalf: "That he is twenty years of age; that he made his home with his father in Orange county; that his home was about two

miles from Cismont; that he only attended school for a couple of years; that he could write his name but could not read; that his parents had to keep him home to work; that on this particular morning he took his father's gun and went out hunting; that he only had four shells; that he had on overalls exhibited in court; that he shot the four shells and killed two squirrels, and put them in the hip pocket of his overalls; that he decided to go to the store and get him a pair of shoes and some shells; that when he got to the store there was a kitten on the porch; that he stopped and played with the kitten a few minutes, and then went in and bought some tobacco and ten shells; that the lady asked him what size shells he wanted, stating she only had a certain size; that he told her he did not know anything about size of shells, but supposed they would do; that he did not know anything about size of shells and he put one in the gun to see of it would fit or was all right, and put the others in his pocket; that he next bought a pair of shoes, and while the lady was in the act of wrapping them up, he happened to see a knife in the show case which he liked, and told her he would take it; she asked him if he wanted it wrapped up, and he told her she could put it in with the shoes; that about that time he saw a shirt or something hanging over toward the side of the store; that he had the gun across his left arm; that he turned and moved a step or so in that direction; that, as he did so, the gun went off; how it happened to go off, he does not know; that when it went off, it kicked and hurt the thumb of his right hand, became unbreached, and the shell fell on the floor; that as the gun went off, the lady hollowed, and that it so frightened him, he could not move for a minute or so; that then he started to go out; that it then occurred to him that he ought to help the lady;

that he then turned and started around the counter where she was, and saw a stream of blood and thought the lady was dead; that this so frightened him he did not know what to do; that he did not have sufficient money to go away on, and it then occurred to him to take what money he could find in the cash drawer, and go away; that he grabbed the cash drawer and took it with him to where it was found and took the money out; that then he felt like going back and telling these people how it happened, but he was afraid to do so; that he decided to go on home, and kept wondering what to do; that the night he was arrested, he had made up his mind to go back and tell them the next day how it happened; that he did not pay for the articles bought; that he had the money to do so but was so frightened when the gun went off that he never thought of it; that he did not take the articles wrapped up with him.  He testified that the money the officers got was the same money he got from the store, and when questioned as to why he bought articles without having money to pay for them, he did not reply; that on the following morning after his arrest he did tell Yowell and Wood, policemen, that his brother did it, and then when they told him he had not seen his brother, he told them he did the shooting but it was accidental, and that he did not take the money; that he told the jailor, Mr. Jones, the morning after his arrest, that the discharge of the gun was accidental, and that he wanted to go back and tell the people how it happened."

The evidence in the case was conflicting, the statements of the accused glaringly contradictory, and clearly presented an issue for the jury, and the jury having, on competent evidence, found the accused guilty, the case is not one to be disturbed by this court.

In *Judd* v. *Commonwealth*, 146 Va. 267, 135 S. E. 710, Judge Burks said: "We know of no safer way of settling a question about which the principal parties are in conflict, and greatly tempted to prevaricate, than by the verdict of an impartial jury, under proper instructions of the court. They should consider all of the circumstances of the case, bearing in mind the presumption of innocence of the accused, and the support required to the testimony of the prosecutrix. When they have done this and are satisfied beyond a reasonable doubt of the guilt of the accused, their verdict cannot be disturbed by this court, unless, treating the accused as a demurrant to the evidence, the court can say that the verdict is plainly contrary to the evidence, or is without evidence to support it."

The last assignment of error challenges the action of the trial court in overruling the motion in arrest of judgment. It is argued on behalf of the accused that the punishment is excessive. It is hard to conceive of a more dastardly crime than robbery by violence. The assassin who slays his victim is most often impelled by the motive of revenge; not so the highwayman, whose sole motive is the desire for loot. If it takes violence to secure it, he is willing to take the desperate chance of resistance upon the part of his victim, as well as the more desperate chance of a forfeiture of his life as the penalty for his crime.

If the shooting was intentional, and the jury have concluded that question, it is no fault of the accused that Mrs. Mustard was not killed. The two-fold purpose of the criminal law is to provide a punishment for those who break the law and for that punishment to act as a deterrent to others who are criminally inclined. The statute has prescribed as a punishment for the offense charged in the indictment the death penalty, or,

in the discretion of the jury, a penalty of not less than eight years nor more than eighteen years in the penitentiary. The enactment of the statute with its varying degrees of punishment was a constitutional exercise of the legislative power.

We find no error in the refusal of the trial court to disturb the verdict of the jury, and the case will be affirmed.

*Affirmed.*