# Richmond

JOSEPH JONES V. COMMONWEALTH OF VIRGINIA.

February 20, 1939.

Record No. 2065.

Present, Campbell, C. J., and Holt, Hudgins, Gregory,
Eggleston and Spratley, JJ.

The opinion states the case.

*William Davis Butts,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Joseph L. Kelly, Jr., Assistant Attorney-General,* for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

This writ of error brings under review a verdict and judgment wherein the accused was found guilty of robbery, and sentenced to confinement in the penitentiary for ten years.

On March 3, 1934, about three a. m., three negroes, Harrison Kemp, William Washington, a half brother of the accused, and Joseph Jones, the accused, were going home and had actually turned from the street into a yard. All were under the influence of liquor, but were not otherwise disorderly. J. Leslie Curtis, a police officer of the city of Hampton, came up in a motor car and seeing them, undertook to place all three of them under arrest, although they were molesting no one. Kemp was put in the police car; Washington protested, and while the officer was scuffling with him, Jones, the accused, who had also been told to get in the police car, ran away. During the scuffle, the police officer fired his pistol. Jones, upon hearing the shot, returned to the scene, and found his half brother and the police officer struggling together on the ground. He did not strike the officer, display any weapon against him, or say anything to him. He went around the back of the car and reaching over the officer's shoulder, took the pistol from the officer's hand, and immediately went away. The officer called to him, "Boy, come back here," but Jones did not go back. He later threw the pistol away. On the next day he returned to his employment in another State, and did not come back to Virginia until 1936. The officer said that his hand from which the pistol was taken was thereby made "sore a month."

On December 5, 1937, the accused was arrested on another charge, and, when brought into the police station, Officer Curtis asked him: "Are you the man who took my pistol sometime back?" The accused replied, "Yes, sir." He was then asked what he had done with the pistol, and replied, "I threw it in Dyke's Creek." Subsequently the accused, for his acts on March 3, 1934, was indicted for robbery and convicted.

■ The only assignment of error is based on the trial court's refusal to set aside the verdict on the ground that the Commonwealth's evidence is not sufficient to establish the *animus furandi,* one of the essential elements of robbery.

■ Virginia Code 1936, section 4405, prescribes the punishment for robbery, but leaves the definition of the crime as it was defined at common law. *Brookman* v. *Commonwealth,* 151 Va. 522, 145 S. E. 358; *Houston* v. *Commonwealth,* 87 Va. 257, 12 S. E. 385.

■■ The common law definition of robbery, repeated in numerous decisions of this court, is: "Robbery is an aggravated form of larceny, but is treated as a distinctive crime. It is the taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation. Clark's Crim. Law (2d Ed.), p. 323." *Butts* v. *Com.,* 145 Va. 800, 133 S. E. 764, 767; *Houston* v. *Com., supra;* and *Jordan* v. *Com.,* 25 Gratt. (66 Va.) 943.

The Commonwealth relies upon the following circumstances to establish the criminal intent or the *animus furandi:* (1) The accused wrenched the pistol from the hand of the officer with force; and (2) that he took complete possession of the pistol, carried it away and made such disposition of it that the officer was deprived permanently of his property.

The accused, denying the existence of such intention, relies upon: (1) The fact that he and his companions were returning from a party, and had entered into no agreement to rob the officer; and. (2) the circumstances to show that the taking was solely for the purpose of preventing injury to his half brother.

■ The *animus furandi,* in the connection here used, is generally translated as an "intent to steal," a "criminal intent," or an "intent to feloniously deprive the owner permanently of his property." *Butts* v. *Com., supra.*

■ To constitute robbery, the act must be done with a specific criminal intent existing at the time of the com-

mission of the act. To sustain the conviction here, the felonious intent must be shown by the Commonwealth to have existed at the moment the accused snatched the pistol from the hand of the officer. If the criminal intent did not exist when the alleged offense was committed, the crime has not been established. The intent subsequent to the taking is immaterial. *Jordan* v. *Com., supra; Butts* v. *Com., supra.*

Prior to the time that the officer attempted to make the arrest, and before the pistol was fired, the circumstances do not indicate that there was any criminal intent existing in the mind of Jones. He appears only to have been intent upon avoiding trouble, as evidenced by his flight. His chief desire was to avoid contact with the law. There was nothing to animate him except the motive of self-preservation. The first disturbance was created when the officer undertook to make the arrest. The second occurred when the officer fired the pistol. Jones' flight was arrested both by the sound of the pistol shot and what he then saw. In the emergency created thereby, he acted on the spur of the moment, and in the face of conditions then existing. It was not difficult to foresee a dangerous situation. A natural first motive was to remove the source of the danger. This was doubtless strengthened by the fact that the prisoner of the officer was a relative of the defendant. Certainly it cannot be fairly inferred that the accused intended to go back to the scene of the struggle to offer himself as a target for the pistol, or to expose himself to an offense against a representative of the law from whom he was attempting to escape.

The intent to steal does not exist when a man undertakes to recover forcibly his own property under a *bona fide* claim of ownership. *Jordan* v. *Com., supra.* By analogy, an act done with the sole intent to prevent injury to another should be upon the same basis. In one instance the moving intent is to preserve the possession of property; in the other to protect the person. In both cases, the intention to steal, or to deprive another permanently of his property, is lacking. The intent is based upon different

motives and grounds from those which create and indicate criminal intent.

In order for the question of criminal intent to be a jury question, there must be some evidence of such intent. When there is no such evidence, and the circumstances fairly negative such intent, the question is one of law for the court.

It is not altogether unusual for a third person to take a weapon from the person of one of two men engaged in a physical struggle. Sometimes in the stress of the moment the weapon is destroyed; at other times it is thrown away. Reasons for taking the weapon may be apparent. Reasons for subsequent action may be dictated by the circumstances, and are by no means necessarily related to the first action.

The subsequent action of the defendant in failing to return the pistol may be subject to criticism; but when we consider the different circumstances surrounding the negro defendant and the police officer, and the difficulties which the negro would have faced in subsequently giving himself and the weapon up, as is evidenced by his conviction, one is forced to the more reasonable view that the defendant was seeking to avoid trouble rather than to incur it, even though he erred in the course adopted.

In the absence of vocal expressions evidencing intention, we must look to actions and surrounding incidents. The ancient maxim, "Actions speak louder than words," has been so often applied in the determination of judicial questions as to become a canon of the law.

Here the complete lack of any preconceived plan to commit larceny or robbery, the flight of the accused, his return to the scene only after the firing of the shot, the struggle between the officer and the brother of the defendant, the danger to the latter arising therefrom, and the mere taking of the pistol without any attempt to injure the officer, are all circumstances pointing in but one direction,—an effort to assist or protect a relative in trouble. Not a single instance, including the throwing away of the pistol, points to an intention on the part of the defendant to enrich himself of the property of another. In fact, all of the circum-

stances, certainly prior to the disposition of the weapon, absolutely repel an intention to commit robbery. And, as we have stated, we must look to the intention as it existed at the time of the taking rather than to its formation subsequently.

At most, under the record here, the defendant was merely guilty of a misdemeanor, an assault and battery upon the officer, or an interference with and obstruction of the officer in the performance of duty.

The law is intended to be just. In its administration, we look to the rendering of justice. When these objects are not achieved, both the law and its administration lose respect and force. We hold no brief for those who would obstruct the law; but in the extensive application of the law, we must give consideration to the various motives which influence acts bringing on the necessity for its application.

William Washington, the half brother of the accused, for his part in this affair, was fined for drunkenness, and also $50.00 for resisting arrest.

The punishment of the accused, ten years in the penitentiary, under the circumstances, appears harsh and unreasonable. The jury, by their verdict, manifested their hostility towards interference with an officer in the discharge of his duty. But the evidence does not justify a fair inference that the offense was more than a misdemeanor. The verdict shows a failure of the jury to consider elements favorable to the accused. In our effort to obtain and preserve justice, we cannot permit a blind adherence to strict technical rules to obscure the reasons upon which the law is based and to which it owes its life.

The judgment of the trial court is reversed. The case is remanded for a new trial in accordance with the views herein expressed. In the event of conviction upon such trial, the accused will be given consideration for his imprisonment since December 5, 1937.

*Reversed and remanded.*