Present: Hassell, C.J., Keenan, Koontz, Lemons, Kinser, and Goodwyn, JJ., and Carrico, S.J.

COMMONWEALTH OF VIRGINIA

OPINION BY

v.  Record No. 081720      SENIOR JUSTICE HARRY L. CARRICO

September 18, 2009

JASON WILLIAM ANDERSON

FROM THE COURT OF APPEALS OF VIRGINIA

PROCEDURAL BACKGROUND

In a bench trial held in the Circuit Court of the City of Virginia Beach, the defendant, Jason William Anderson, was convicted under indictments charging him with conspiracy to commit robbery (Code § 18.2-22), robbery with the use of a gun or simulated gun (Code § 18.2-58), and use of a firearm in the commission of a felony (Code § 18.2-53.1).  The circuit court sentenced the defendant to incarceration in the Virginia Department of Corrections for terms of five years for conspiracy, seven years for robbery, and three years for use of a firearm in the commission of a felony, with all but three years suspended.

In a published opinion, the Court of Appeals of Virginia affirmed the defendant's conviction for conspiracy to commit robbery but reversed his convictions for robbery and use of a firearm in the commission of robbery.  The Court of Appeals remanded the case to the circuit court for imposition of a new sentence on the conspiracy conviction.  Anderson v.

Commonwealth, 52 Va. App. 501, 509-10, 664 S.E.2d 514, 518-19 (2008). The Commonwealth appeals from the Court of Appeals' reversal of the defendant's convictions for robbery and the use of a firearm in the commission of robbery.

### FACTUAL BACKGROUND

The Commonwealth's evidence shows that the defendant and a friend, Corey Edwards, were both cashiers at a Dick's Sporting Goods store in the City of Virginia Beach. On several occasions prior to the events in question, they discussed staging a robbery at the store. On one morning in early November 2006, the plan was for the defendant "to come in and rob [Edwards while he] was working downstairs." The defendant "walked in the store like normal people" and looked around, but "then walked out" without taking any money from Edwards. The defendant later explained to Edwards that he left because he "didn't see [him] downstairs."

On the morning of November 18, 2006, the defendant was on duty at a second floor cash register and telephoned Edwards at his home and told him that "it was time," that there was "enough money," and that Edwards "should come [and] get it." Edwards said he was sleeping and the defendant should call back later.

Approximately an hour and a half later, the defendant called Edwards again and said that he had been instructed to go to the cash register "downstairs to relieve somebody's lunch

break," that they "had an hour" to stage the robbery, and that the defendant "would take his register and everything . . . he had – his receipts, his checks, everything – down to that register."  The defendant said it "would be easy . . . just show them the gun, and . . . threaten somebody."  Edwards replied that he did not want to use a "real gun" and "wasn't going to do it" but that he would "get somebody to do it and we'd be up there."

Edwards enlisted the assistance of Noel McBride, a juvenile, who was a friend of both Edwards and the defendant. McBride had been present when Edwards and the defendant discussed "the topic of the robbery . . . a week or two" before it was actually staged.  Edwards had McBride secure from a neighbor "an airsoft gun" that holds  "CO2 and shoots plastic pellets."

Edwards drove McBride to Dick's and parked on "the next street over away from [the store]."  McBride "hopped out [of] the car and proceeded to go in [the store]."

At that point in time, Edward Lee Rinehart, Jr., an employee of Dick's and "the department lead" in the store's first-floor golf department, was standing some thirty-five to forty feet from the store entrance discussing a matter with a fellow employee.  Rinehart saw McBride enter the store wearing a

3

hooded sweatshirt with a bandanna over his face. McBride made "eye contact" with Rinehart but then turned his back to him and walked sideways to the cash register manned by the defendant.

Rinehart started to walk toward the cash register because he thought "something didn't look right" and he had "a feeling we're about to get robbed." However, when he was about fifteen feet away from the cash register, he saw McBride withdraw a weapon from his waistband. The weapon gave Rinehart "some concern," and he "stopped right where [he] was." He thought the weapon was a "semi-automatic pistol . . . probably a nine millimeter or a forty-five." Rinehart then "dialed the phone to 911."

When McBride approached the defendant, he said, "[y]ou know what this is," withdrew the weapon from his waistband, and pointed it at the defendant. The latter "emptied the register and put the money in a bag" which he handed to McBride, who then ran out of the building without ever having looked back at Rinehart. Rinehart followed "at a safe distance without leaving the store," meanwhile reporting McBride's actions while "on the phone with 911."

It just so happened that Jason Kolar, a sergeant on the Virginia Beach police force, was sitting in his cruiser outside Dick's when he saw a man running from the store "at a high rate of speed" with his face "partially covered, and . . . carrying

4

something in his hand."  Kolar followed the man and saw him "jump into a gold Dodge Stratus."  Kolar followed the vehicle and called into dispatch and received a "no" response when he asked whether there had been any kind of robbery at Dick's, but shortly was notified that a robbery "had, in fact, . . . [j]ust occurred" at Dick's.  Kolar continued to follow the vehicle until it pulled into a driveway and stopped.

Kolar radioed for assistance and Sergeant Richard Wallace of the Virginia Beach police force soon arrived.  When the officers went up to the stopped vehicle, there were two people in it, Edwards, the driver, and McBride, a passenger.  The officers observed "a large quantity of money in the driver's door panel," totaling approximately $1,195.00, as well as "two grayish-colored bandannas that were used in the robbery" and "a pullover sweatshirt type."  The officers also found "what turned out to be an air pistol" that looked "[l]ike a semi-automatic handgun."

Testifying in his own defense, the defendant maintained that that he had never discussed the subject of robbery with either Edwards or McBride.  He said he was shocked "when all this happened."  However, at the end of the trial, the court stated that it "just [did] not place a lot of credibility in the defendant's testimony."

ANALYSIS

The Commonwealth's sole assignment of error is that "[t]he Court of Appeals erred in finding that the Commonwealth had not proven intimidation of the robbery victim."  Since this assignment challenges the sufficiency of the evidence, we will view the evidence in the light most favorable to the Commonwealth, the prevailing party in the circuit court, according it the benefit of all reasonable inferences fairly deducible therefrom.  Dowden v. Commonwealth, 260 Va. 459, 461, 536 S.E.2d 437, 438 (2000).  We will disturb the judgment of the circuit court only upon a showing that it is plainly wrong or without evidence to support it.  Viney v. Commonwealth, 269 Va. 296, 299, 609 S.E.2d 26, 28 (2005).

> Robbery at common law is defined as "the taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation."  The phrase "of the personal property of another, from his person or in his presence," has been broadly construed to include the taking of property from the custody of, or in the constructive possession of, another.

Durham v. Commonwealth, 214 Va. 166, 168, 198 S.E.2d 603, 605-06 (1973) (citations omitted).

> [When] the owner of personal property, or another having custody or constructive possession of the same, interposes himself to prevent a thief from taking the property, and the force and violence used to overcome the opposition to the taking is concurrent or concomitant with the taking, the thief's action constitutes robbery.

6

<u>Jones v. Commonwealth</u>, 267 Va. 284, 289, 591 S.E.2d 68, 71 (2004).

Intimidation is defined as follows:

Unlawful coercion; extortion; duress; putting in fear.

To take, or attempt to take, by intimidation means willfully to take, or attempt to take, by putting in fear of bodily harm . . . . Intimidation . . . means putting a victim in fear of bodily harm by exercising such domination and control of her as to overcome her mind and overbear her will.

<u>Sutton v. Commonwealth</u>, 228 Va. 654, 663, 324 S.E.2d 665, 670 (1985) (internal quotation marks omitted); <u>see also Bivens v. Commonwealth</u>, 19 Va. App. 750, 752-53, 454 S.E.2d 741, 742 (1995). And, as the Commonwealth acknowledges on brief, "[t]o sustain a robbery conviction, force or intimidation must be directed at the person of the victim." <u>Spencer v. Commonwealth</u>, 42 Va. App. 443, 449, 592 S.E.2d 400, 403 (2004).

The Commonwealth contends that Rinehart, Dick's "department lead" in its golf department, "was the real victim of the robbery [in this case] and was intimidated by the display of a firearm." The Commonwealth maintains that Rinehart "had constructive possession of the property" which was stolen, that "in relation to [the defendant], [he] had equal or superior authority over the cash in the defendant's register," and that he was under a duty to his employer to protect its property from being stolen.

7

The Commonwealth asserts that two factual findings made by the circuit court support the proposition that Rinehart was attempting to discharge his duty to his employer when he was stopped by the display of the firearm. The first of these findings was that "Rinehart was on his way over there to help stop this thing" and the second was that Rinehart "interpose[d] himself to prevent a theft of the property."

"[W]e will not disturb the factual findings of the trial court unless plainly wrong or unsupported by the evidence." Commonwealth v. Jackson, 276 Va. 184, 192, 661 S.E.2d 810, 813-14 (2008) (citation and internal quotation marks omitted). According to the Commonwealth, its evidence showed that Rinehart "was planning to approach more closely to attempt to forestall the robbery," but stopped when "McBride, having seen Rinehart, displayed the weapon to him when he withdrew it from his pocket and pointed it at [the defendant]." Thus, the Commonwealth says, the "money was taken from [Rinehart's] possession through intimidation directed at him."

The Commonwealth further avows that Rinehart was "put in fear," that he "surrendered the property because he was afraid that otherwise he would be shot," and that "[h]is fear . . . overcame [his] mind and overbore his will." Finally, the Commonwealth claims that Rinehart "testified that he was

8

intending to intervene in what appeared to be a robbery but stopped when he saw the gun."

We disagree with the Commonwealth. In the first place, we take issue with the Commonwealth's assertion that "[t]he money was taken from [Rinehart] through intimidation directed at him." Here, the Commonwealth misstates the record when it says that "McBride, having seen Rinehart, displayed the weapon to him when he withdrew it from his pocket and pointed it at [the defendant]." (Emphasis added.) Nothing in the record supports the statement that McBride displayed the weapon to Rinehart. The latter may have seen the weapon when it was displayed to the defendant, but it is not correct to say that it was displayed to Rinehart.

With respect to what McBride did in relation to Rinehart, all the Commonwealth has to rely upon is the "eye contact" McBride had with Rinehart and Rinehart's view of the weapon when McBride reached the cash register and displayed it to the defendant. But McBride kept his back turned to Rinehart the whole time after the "eye contact" and never again even looked in his direction or otherwise paid him any attention before leaving the store.

Furthermore, we take issue with what the Commonwealth says about Rinehart's reaction to the situation. Rinehart never testified "that he was intending to intervene in what appeared

9

to be a robbery." The words "intending" and "intervene" or anything close to them do not appear anywhere in his testimony. Nor did he ever say that he "was planning to approach more closely to attempt to forestall the robbery" or that he "was on his way to help stop this thing." The record does not show what his intent or plan, if any, may have been, nor does it permit a reasonable inference to be drawn as to what he intended or planned to do, even when the evidence is viewed in the light most favorable to the Commonwealth. And he did not "interpose[]" himself" to stop the theft. To interpose means to "put (oneself) between." Webster's Third New International Dictionary 1182 (1993). Rinehart stopped fifteen feet short of putting himself between McBride and the defendant.

But perhaps the Commonwealth's most inaccurate characterization of Rinehart's reaction to what was taking place is found in the Commonwealth's assertion that he was "put in fear" by the display of the weapon. Rinehart did not say he was put in fear at the sight of the weapon. All he said was that he stopped "[b]ecause there was a weapon involved" and "that [gave him] some concern," a mild reaction, indeed, from someone the Commonwealth would have us believe had been traumatized by his experience. Having "some concern" is certainly not tantamount

to being "put in fear."* It is also inaccurate for the Commonwealth to say that Rinehart's "fear . . . overcame his mind and overbore [his] will." Rinehart did not even suggest that he suffered such disabilities.

In the end, about all the Commonwealth is left with is McBride's "eye contact" with Rinehart and the latter's testimony that he stopped "[b]ecause there was a weapon involved" and "that [gave him] some concern." Thus, the evidence is insufficient to support the circuit court's factual findings, to establish that Rinehart was intimidated, or to support the circuit court's judgment convicting the defendant of robbery and use of a firearm in the commission of robbery. Accordingly, we will affirm the judgment of the Court of Appeals.

Affirmed.

JUSTICE LEMONS, with whom JUSTICE KINSER joins, dissenting.

In my opinion, the only legal principles controlling this appeal are the following:

> We have stated that "[o]n appeal, great deference is given to the factfinder who, having seen and heard the witnesses, assesses their credibility and weighs their testimony. Thus, a [circuit] court's judgment will not be disturbed on appeal unless it is plainly wrong or without evidence to support it." Young v. Commonwealth, 275 Va. 587,

---

* The dissent quotes the following from the circuit court's summary of its basis for finding the defendant guilty of robbery: "Was Mr. Rinehart put in fear? He said yes." We have yet to find such a response by Rinehart anywhere in the record.

11

> 590-91, 659 S.E.2d 308, 310 (2008); accord <u>Walton</u>
> <u>v. Commonwealth</u>, 255 Va. 422, 426, 497 S.E.2d
> 869, 871 (1998).  The issue that we consider,
> upon appellate review, is " 'whether, after
> viewing the evidence in the light most favorable
> to the prosecution, <u>any</u> rational trier of fact
> could have found the essential elements of the
> crime beyond a reasonable doubt.' "  <u>Maxwell v.</u>
> <u>Commonwealth</u>, 275 Va. 437, 442, 657 S.E.2d 499,
> 502 (2008) (quoting <u>Jackson v. Virginia</u>, 443 U.S.
> 307, 319 (1979)).

<u>McMillan v. Commonwealth</u>, 277 Va. 11, 18-19, 671 S.E.2d 396, 399 (2009).  "When a defendant challenges the sufficiency of the evidence, the Court reviews the evidence in the light most favorable to the Commonwealth, drawing all reasonable inferences in its favor as the prevailing party below."  <u>Jones v.</u> <u>Commonwealth</u>, 277 Va. 171, 182, 670 S.E.2d 727, 734 (2009) (citing <u>Perez v. Commonwealth</u>, 274 Va. 724, 728, 652 S.E.2d 95, 97 (2007)).  I do not believe the majority has followed these principles.

The facts and permissible inferences viewed in the light most favorable to the Commonwealth in this case are as follows. In November of 2006, Anderson and Edwards were both employed at a Dick's Sporting Goods store in Virginia Beach.  The two of them "had talked previously about possibly robbing Dick's Sporting Goods and it would be easy and it was nothing basically."  They schemed to stage a robbery of Anderson while he was working as a cashier at the store.  Anderson had stated, "[w]e could go in there, just show them the gun, and it would be

simple as one, two, three to threaten somebody and get us some money."  On the appointed day for the commission of the crime, Edwards involved McBride in the plan.  Anderson, Edwards and McBride had previously discussed the plan approximately one to two weeks earlier.

On the day of the criminal offense, Anderson called Edwards on the telephone to alert him to the precise time that Anderson would be at a particular cash register in the store.  Edwards enlisted the help of McBride and drove him to the store. McBride entered the store with a $CO_2$ powered pellet gun.  He was wearing a black hooded sweatshirt, with the hood pulled up and a bandanna over his face.  When McBride entered the store, he made eye contact with Rinehart, an employee of the store who was titled as a "departmental lead" in the golf department.

Rinehart testified that he observed McBride walk to the register where Anderson was waiting.  Rinehart stated that "something didn't look right" and he had "a feeling we're about to get robbed."  He and another employee, identified as "J.B." began walking toward the register. Rinehart testified that he stopped about "[f]ifteen, sixteen" feet from the gunman when he "saw a weapon come out of [McBride's] waistband."  The following colloquy took place at trial:

> Q   Did you continue to walk towards the register when you saw the hooded man pull the gun out of his waistband?

A    No, sir.  I stopped right where I was.

Q    Why did you stop?

A    Because there was a weapon involved.

Q    Did that give you some concern?

A    Absolutely.

Q    What did the weapon look like?

A    I would say it was obviously a semi-automatic pistol. My first impression it was probably a nine millimeter or a forty-five.

Q    Do you have any familiarity with firearms?

A    Yes, sir.  Spent six years in the United States Marines.

Q    Did it look like a real gun to you?

A    Yes, sir.

Q    So you didn't go any closer?

A    No, sir.

In the court's rendition of judgment, the trial judge stated:

> [T]he court finds the following:  Number 1, it appears to the court from a credibility standpoint of the witnesses and all the evidence that I've heard that a conversation took place between the perpetrators of the robbery and the defendant.
>
>             . . . .
>
> So I'm convinced and there's no doubt in my mind that the parties talked about this robbery on the telephone – Number 1.
> So then we go to, Is there a conspiracy? Absolutely.  In my opinion there's no doubt in my

14

mind that there was a conspiracy to rob Dick's Sporting Goods.

Number 2, What about the robbery? Well, we know that the perpetrator went in with a gun. Was Mr. Rinehart put in fear? He said yes. He was going – He said, Something's going to happen. I'm going over to the cash register; and he started walking towards the cash register, saw the person pull a gun out, and stopped. He had an obligation to protect the assets of the company. And so he, in essence, was put in fear because there was a gun. Otherwise he would have gone over there.

So I find from a factual standpoint that the defendant's testimony corroborates the fact that he's guilty and how.

Commenting upon the case of Durham v. Commonwealth, 214 Va.

166, 198 S.E.2d 603 (1973), the trial judge stated:

But in the Durham case it says where the owner of the personal property, or another having custody or constructive possession of same, interposes himself to prevent a theft of the property – and I think that's exactly what we have right here. I think Mr. Rinehart was on his way over there to help stop this thing and he saw the gun and he stopped.

Revisiting the issue at sentencing the trial court observed:

The court has found as a matter of fact that the defendant in this case was obviously conspiring with others to commit this act. He went to the extent of calling – making a phone call saying, I'll be down in the downstairs cash register for the next hour, I think, or something like that. At any rate, the evidence is pretty clear that this, in fact, was a robbery. The – they're willing participants in it.

And the question is was anybody placed in fear? I guess that's one of the issues. And the answer is yes. Mr. Rinehart was an employee of the store, and he certainly has an obligation not to allow people to be taking stuff out of the store. And he was walking over, and he saw the

15

gunman come in with the gun and a hood; and he knew there was a robbery. Eye contact was made. And so if he was not afraid, he would have continued to walk. He stopped and he was in fear. He had an obligation to make sure that the money was not taken. The money was taken. And therefore I find nothing to – that has been presented to change the ruling of the prior ruling of the court, and that's it.

As previously stated at the outset of this discussion, the only real issue in this appeal is whether this Court will properly apply our appellate rules of review. I do not believe the majority has done so.

> In Virginia the punishment for robbery is fixed by Code § 18.1-91, but there is no statutory definition of robbery. Hence we look to the common law for its definition. Butts v. Commonwealth, 145 Va. 800, 811, 133 S.E. 764, 767 (1926); Mason v. Commonwealth, 200 Va. 253, 254, 105 S.E.2d 149, 150 (1958).
>
> Robbery at common law is defined as "the taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation." Jones v. Commonwealth, 172 Va. 615, 618, 1 S.E.2d 300, 301 (1939); Mason v. Commonwealth, supra, 200 Va. at 254, 105 S.E.2d at 150. The phrase "of the personal property of another, from his person or in his presence" has been broadly construed to include the taking of property from the custody of, or in the constructive possession of, another. Falden v. Commonwealth, 167 Va. 542, 545, 189 S.E. 326, 328 (1937); State v. Butler, 27 N.J. 560, 589, 143 A.2d 530, 547 (1958).

. . . .

> Where the owner of personal property, or another having custody or constructive possession of the same, interposes himself to prevent a thief from taking the property, and the force and

16

> violence used to overcome the opposition to the taking is concurrent or concomitant with the taking, the thief's action constitutes robbery. State v. Butler*, supra*, 27 N.J. at 591, 143 A.2d at 547, 548; State v. Culver, 109 N.J. Super. 108, 112, 262 A.2d 422, 425 (1970); Brown v. State, 61 So. 2d 640 (Fla. 1952), cert. denied, 345 U.S. 913 (1953); State v. Burzette, 208 Iowa 818, 222 N.W. 394 (1928).

Durham*,* 214 Va. at 168-69, 198 S.E.2d at 605-06.

The Commonwealth's theory of the case is relatively simple:

1. Anderson conspired with others to fake a robbery; he intended the scheme to involve the presentation of a handgun which served the purpose of intimidating any other employees who may have intervened;
2. Rinehart was an employee who had constructive possession of the money that was ultimately taken and had a responsibility to preserve the assets of his employer;
3. Rinehart saw what he thought was a robbery of the cashier and moved to intervene, but he was stopped when a gun was introduced to the situation;
4. Rinehart, who had constructive possession of the money, was intimidated and ceased his intervention, and consequently, under Virginia law, Rinehart was a victim of robbery. Anderson was a principal in the commission of the crime.

The majority reduces this entire case to two questions: Is the evidence sufficient to prove that Rinehart was intervening on behalf of his employer and whether Rinehart was intimidated by the events in question? It is important to note at the outset that even the defendant does not argue that the evidence was insufficient to prove that Rinehart was intervening on behalf of his employer. Indeed, Anderson, in his brief before this Court states, "Whether McBride or Anderson . . . took the property of

Dicks from the person or presence of Rinehart need not be addressed at great length here." Not only was it not addressed "at great length here," it was not addressed at all in the trial court, the Court of Appeals, or in Anderson's brief before this Court. The majority opinion raises this issue for the first time on appeal in this court. Not only is the issue without merit, but we would never allow the defendant to raise such an issue for the first time on appeal in this Court. It seems inappropriate for the Court to do so sua sponte.

The issue that Anderson raised at all times constitutes the only legitimate issue before the Court. Is the evidence sufficient to prove that Rinehart was intimidated? And on review in this Court the question is, based upon the evidence and reasonable inferences drawn therefrom, taken in the light most favorable to the Commonwealth, was the trial court plainly wrong or without evidence to support its judgment that Rinehart was intimidated and consequently, that Anderson was guilty as a principal to the crime of robbery?

The trial court heard Rinehart's testimony that he saw what he thought was a robbery in the making – clearly a reasonable conclusion from observing McBride come into the store with a hooded sweatshirt over his head and a bandanna on his face. Rinehart stated that McBride approached the cash register and that as a result of these movements and his concern that a

robbery was about to take place, he and another employee moved toward the cash register as well. Rinehart stopped within fifteen to sixteen feet from McBride when McBride produced a handgun from his waistband. When asked if the presentation of a weapon concerned him, Rinehart understandably stated, "Absolutely." His testimony indicated that the production of the gun is the reason that he stopped his intervention. It is also important to note that Rinehart stopped his intervention at the register and did not try to prevent McBride from exiting the store with the money. The reason why is quite clear – McBride had a gun.

The majority makes much of the fact that McBride did not point the gun at Rinehart. But this conclusion involves a fundamental misunderstanding of the law of robbery in Virginia. The weapon only needs to be introduced into the equation; pointing the weapon at the victim is not required – presentment is sufficient. Code § 18.2-58 codifies this understanding:

> If any person commit robbery by partial
> strangulation, or suffocation, or by striking or
> beating, or by other violence to the person, or
> by assault or otherwise putting a person in fear
> of serious bodily harm, or by the threat or
> presenting of firearms, or other deadly weapon or
> instrumentality whatsoever, he shall be guilty of
> a felony.

Additionally, McBride did point the gun at Anderson, and Rinehart's concern for his fellow employee would be sufficient

19

to satisfy this element of the offense.  With regard to the elements of robbery, "the threat of immediate bodily injury or death need not be directed at the owner himself; it may be made to a member of his family, or other relative, or even to someone in his company, though there be no threat to do harm to the owner himself."  Wayne R. LaFave, Substantive Criminal Law § 20.3(d)(2), at 186 (2nd ed. 2003).  Of great importance here, and never mentioned by the majority, the trial court viewed a video of the robbery itself.  As the trier of fact without a jury, the trial judge was able to observe McBride's actions and Anderson's reactions during the event.

Perhaps most puzzling of all is the majority's attempt to distinguish between "being put in fear" and "having some concern," a distinction that, in this context, is without substance. This case was tried by the court without a jury. The trial court stated, "Rinehart was on his way . . . to help stop this thing and he saw the gun and he stopped. . . Well, we know the perpetrator went in with a gun.  Was Mr. Rinehart put in fear? He said yes."  As the majority correctly notes, Rinehart did not use the word "fear."  However, criminal juries in Virginia are routinely instructed that they are entitled to "use their common sense" in consideration of the evidence and that they may "draw reasonable inferences" from the evidence. Here the trial judge, as fact-finder did just that – utilized common

sense and reasonable inferences to conclude that "[Rinehart] was walking over, and he saw the gunman come in with the gun and a hood; and he knew there was a robbery. Eye contact was made. And so if he was not afraid, he would have continued to walk. He stopped and he was in fear."

The trial court's determination on the facts of this case, including observation of the videotape of the event itself, cannot be said to be plainly wrong or without evidence to support it.  Either Rinehart himself was intimidated or pointing a weapon at his fellow employee satisfied the element of the offense.

Anderson told Edwards that the robbery "would be easy and it was nothing basically."  He said "[w]e could go in there, just show them the gun, and it would be simple as one, two, three to threaten somebody and get us some money."  (Emphasis added.)  Clearly, Anderson intended that threat or intimidation of "somebody" be used to commit the crime.  That "somebody" was Rinehart.  That crime is called robbery.

I dissent.